| 90 | 417 |
|---|---|
| 113 | 326 |
| 90 | 417 |
| 115 | 617 |
| 90 | 417 |
| 150 | 326 |

# Thomas C. Severance v. Charles L. Severance et al.

*Will—Undue influence.*

1. Undue influence cannot be predicated upon opportunity alone, nor upon conduct in the line of filial duty, nor upon a disposition of property not in accordance with the statute of descent.

2. When the person of the testator has been by common consent committed to the care of him who is charged with the exertion of undue influence, there is no presumption that it has been exercised.

3. As to what influence will vitiate a will, see *Maynard v. Vinton*, 59 Mich. 139, 153, cited with approval by the Court.

4. The court properly withdrew the question of undue influence from the consideration of the jury in this case.

Error to Oakland. (Moore, J.) Argued January 19, 1892. Decided March 4, 1892.

Appeal from the probate of a will. Affirmed. The facts are stated in the opinion.

*Jerome W. Robbins,* for contestants and appellants.

*Arthur R. Tripp* (*Aaron Perry,* of counsel), for proponent and appellee.

McGRATH, J. This is an appeal from the probate of the will of Charles Severance, deceased.

The probate was contested upon two grounds: (1) Incompetency; and (2) undue influence, exercised by Thomas C. Severance, the residuary legatee. The court took the question of undue influence from the jury, but submitted the question of mental capacity to the jury, and the jury found for proponent.

Charles Severance died July 21, 1887, aged 81 years, leaving five sons and two daughters, viz., Charles L., John, Nathan E., Jotham K., and Thomas C. Severance, and Adelia Williams and Elmina Sherman, as his sole heirs at law. The will in question was executed May 6, 1882. The testator's weakness was his indulgence of his children. As far back as 1865 he had given to John and Charles L. $600 each, as advancements upon their shares of his estate. The testimony as to whether Nathan had received any advancement was contradictory, but it does appear that at one time Nathan was interested in the management of the farm, and that the accounts between father and son had been adjusted by arbitration. In 1879 he conveyed to Jotham 40 acres of land alleged to be then worth $1,200. Before this conveyance his estate was valued at $7,000. At this time he had a floating indebtedness of about $600. He had, by indorsements for Jotham, incurred an additional indebtedness of about $2,600, making a total of about $3,200, bearing 10 per cent. interest. To provide for this indebtedness, and to protect the testator from the importunities of certain of his children, a power of attorney, absolute and irrevocable, was, by common consent, and with the knowledge of the children generally, executed by the testator to Thomas C., who took charge of the farm, and with whom the testator lived from that time until the time of his death.

On April 3, 1879, Charles L. Severance, one of the contestants, writes a letter to his sister, in which he says:

"Father's health is poorly most of the time. Jote [Jotham] has moved away, and Mina is there keeping house for him. Father has given Chalkley [Thomas C.] all of his property, both real and personal, in order to secure his living. He done it with my advice. You haven't any idea about the situation. Mina and John and

Jote [Jotham] have nearly ruined him. You will be astonished to learn the facts in the case.   *   *   *   So you can plainly see that it was time to have something done to save a living for father. Chalkley [Thomas C.] has had the property appraised, and the whole value is less than $7,000. The place cannot be rented for enough to pay the interest and keep him. I saw over two years ago how things were going, and said a good deal about it, and went so far as to tell father that if he did not put a stop to it he would have to go to the poor-house before he died.   *   *   *   I hope you will not blame me for bringing about this change, for, as it was, there would never have been anything left for any of us."

To take care of the indorsements and of the indebtedness aforesaid, a mortgage bearing interest at 8 per cent. was executed, and this with the knowledge of all concerned.

By the will, Adelia Williams is to receive $1,000, and Elmina Sherman is to receive the income of $500 during her natural life, and at her death that amount is to be paid to her heirs. Then follow these provisions:

"5. The above bequests I hereby declare to be a lien upon my real estate, and to remain such until they have been fully paid and discharged.

"6. Having given to and assisted my other children, except my son Thomas C. Severance, in amounts which at this time I consider all they are entitled to from my estate, and desiring to make this distribution of my property just and equitable so far as possible, I make no provision for them by this will.

"7. All the rest, residue, and remainder of my estate, real and personal, I give, bequeath, and devise to my son Thomas C. Severance, to him and his heirs forever, subject only to my debts and the legacies above provided in the will."

Thus we have an estate, valued at not to exceed $6,000, charged with the funeral expenses, the expenses of administration, a mortgage of $3,200, and legacies amounting to $1,500. The testator had a stroke of paralysis in 1885, and from that time until his death he

was enfeebled in body and mind.    Thomas C. supported his father for eight years prior to his death from the income of a farm which could not "be rented for enough to pay the interest and keep him," and in consideration thereof, and as his share of the estate, Thomas C. received a possible $1,300, out of which he is to pay the funeral expenses and the expenses of administration.

Elmina Sherman, a daughter, is called by contestants, and on cross-examination says:

"About 13 years ago my father talked with me about making a will, and said he thought he ought to give Adelia Williams $1,000, and me $500.    I said I was satisfied with her having more than I, because she deserved it.    My brother Charley was in the room.    I am not satisfied with the will, because it only gives me the use of $500, instead of giving me the $500 outright."

In January, 1882, testator had a talk with his sister-in-law about making his will, in which he said that he desired to provide for Adelia; that the boys had had their shares; and that it would not do to give anything to Elmina, because her husband would waste it.

The only question discussed in the brief of counsel for appellants is that of undue influence.    The facts set up as tending to show undue influence are:

1. That "in January, 1879, the proponent took his father to Pontiac, for the purpose of having the second power of attorney made, and took with him a witness of his own selection."

The facts are that the first power of attorney was not witnessed or acknowledged, and that the object of the second instrument was its acknowledgment, so that it might be recorded.    Thomas C., the father, and one Merritt E. Lamb, who was in the employ of Thomas, went to Pontiac together, and Lamb was present when the instrument was executed.    He was not the only witness.    There was no secrecy about the execution of

the powers of attorney. They were executed with the knowledge, consent, and approval of the contestants.

2. On the day that the will is claimed to have been executed "we find the proponent at his attorney's office, with the old gentleman, and a witness from the immediate neighborhood, the son of the man who was guardian of the old gentleman."

No guardian was appointed until 1885. The testimony showed that Thomas C. took the old gentleman to an attorney's office, and left him there, only saying to the attorney that his father wished to do some business. The witness referred to was not the only witness, and he was not there at the suggestion or by the procurement of Thomas C.

3. "From the time the proponent got possession of his father's property, in 1879, to the time of the making of the will, the proponent always shadowed his father when there was business of any kind to be done."

There is absolutely no testimony tending to support this allegation. The only business done was the execution of these powers of attorney and the making of the will.

4. That Thomas C. managed to get all of the proceeds of the farm.

As already shown, Thomas C. had the care of his father, and no complaint was made by the father, and he alone had the right to complain. From 1879 until 1885, at least, the father, under the finding of the jury, was competent. On one occasion it was suggested to him that he could revoke the power of attorney, but he replied that he had no desire to.

5. John Severance testified as follows:

"I think I saw him [deceased] on the 8th day of May, 1882. * * * * He said he was at Pontiac a few days before that, to get some medicine, and do a lot of trading, and Thomas C.

Severance shut him up in an office out there, and kept him, and he didn't have a chance to do any trading at all."

On cross-examination this witness says that his father told him that—

"He had been to Pontiac to do some trading, and get some medicine; but he did not have a chance to do any trading; that Chalk [Thomas C.] put him in an office, and went off."

The attorney who drew the will testified as follows:

"I think in the afternoon of May 6, 1882, Charles Severance, the deceased, came to my office, and with him was his son Thomas C. Severance. At the time they came there, Martin Richardson was in the office, talking with me. I spoke to them, and shook hands; asked them to have some seats. Mr. Thomas C. Severance, I think· it was, stated that his father wanted to do some business, and he had some errands to do about town; and he didn't take a seat, but went right away. I can't remember exactly the conversation, but, in substance, I asked him (Mr. Severance) what he wanted done, and learned that he wanted to make a will. I then asked him to step into the other room, and we went in there, sat down at the table, he at my left side. I asked him how he wanted his property to go. Mr. Richardson was in the room."

If the first version of John's testimony is accepted, there is nothing connecting it with the day upon which the will was drawn. If the last is accepted, there is nothing improper shown. The real question is, was there anything improper in the conduct of Thomas at the attorney's office? The testimony of Thomas, of the two witnesses, and of the attorney who drafted the will, repel any possible charge of misconduct at that time. The attorney testified that he was not the attorney for Thomas C. Severance, and had never done any business for him.

6. "That in 1865 the deceased let Thomas C. Severance have a farm worth $12,000."

This allegation is not supported by the record.

7. "That in 1881 or 1882 Charles Severance (deceased) told his son-in-law Grover Williams that he wanted to get his property fixed so that each of his children would have an equal share."

This statement in the brief is hardly fair to the Court. What the witness does say is as follows:

"While in my house, he said he wanted to fix his property in some shape, so that everything would be right, and each of his children have an equal share, so far as he could have it. He said my wife had had nothing, Mrs. Sherman had had a portion of hers, and the boys had had what belonged to them. I told him he had better go right to Pontiac, for I presumed he would find lawyers well informed enough to do the business as he wanted it; or he could go to St. Johns, and get a lawyer there. He said he wanted to get his property fixed so that each of his children would have an equal share. He mentioned my wife and Mrs. Sherman. He said the boys had had their shares."

It is upon these allegations alone that counsel desired to go to the jury upon the question of undue influence.

The testimony clearly shows that the selection of Thomas C. for the management of his father's property and for the father's care was by the judgment, consent, and acquiescence of all; that the "boys," as they are termed, had, according to the father, received their proportion of the estate; that the father desired to provide for the daughters; and that the will made the actual and specific provision for the daughters which had been frequently indicated by the father. Proof, it is true, must be made out of circumstantial evidence, but undue influence cannot be predicated upon opportunity alone, nor upon conduct in the line of filial duty, nor upon a disposition of property not in accord with the statute of descent. There is no attempt made to show that any expressed intention of the testator has not been carried

out; on the contrary, all that was expressed was carried into the will as made. Where the person of the testator has been by common consent committed to the care of him who is charged with the exertion of undue influence, there is no presumption that undue influence has been exercised. There is no showing here of restraint or of control or of exclusiveness. After the execution of the will, the testator visited his children frequently, talked freely with his neighbors, and spent an hour at one time and half an hour at another in conversation with the attorney who drew the will. On none of these occasions did he manifest any displeasure about what he had done, or make any complaint as to restraint or lack of perfect freedom to do as he wished, although it does appear that after some years some of his children were trying to come between the father and Thomas.

In *Maynard v. Vinton*, 59 Mich. 153, Mr. Justice CHAMP-LIN, speaking for the Court, says:

"The influence, to vitiate the will, must have been such as to amount to force and coercion, destroying her free agency; and there must be proof that the will was obtained by this coercion; and it must be shown that the circumstances of its execution are inconsistent with any hypothesis but undue influence, which cannot be presumed, but must be proved, and in connection with the will, and not with other things. Neither can it be set aside on the ground of undue influence, unless such influence amounted to a degree of constraint such as the testatrix was too weak to resist, and such as deprived her of her free agency, and prevented her from doing as she pleased with her property. Neither advice nor arguments nor persuasion will vitiate a will made freely from conviction, though such will might not have been made but for such advice or persuasion."

The court was clearly right in taking the question of undue influence from the jury.

We have examined carefully the other questions raised by the assignments, and find no error. It must there-

fore be certified to the circuit and probate courts that the will propounded as the last will of Charles Severance, deceased, is his last will, and is entitled to be admitted to probate as such.

The proponent will recover costs.

The other Justices concurred.