*In re* WILLIAMS' ESTATE.

McKEAND *v*. JONES.

1. WILLS—COMPETENCY—INSANITY—TESTAMENTARY CAPACITY.
   Evidence tending to show that the testator was a man of more than average education and intelligence, was subject to fits of anger, nervousness and irritability, that he used extravagant and profane expressions, and including

testimony of three witnesses who stated their opinion that he was incapable of making a testamentary disposition of his estate, *held*, insufficient to require the court to refuse to admit the will to probate.

2. SAME—BUSINESS ABILITY.

Although business ability may be evidence of mental capacity sufficient for the execution of a valid will, the fact that the testator had disposed of funds he had received from the sale of property prior to his death was not evidence of insanity or mental incapacity.

3. SAME—EVIDENCE—EXTRAVAGANCE.

The court did not commit reversible error at the trial of a will contest in excluding from the evidence deeds of the testator of $28,000 worth of real property that he was alleged to have disposed of during the last twelve years of his life. The proof which was offered to show bad business judgment was not sufficient to establish that he had disposed of more than was necessary to decently maintain the testator and preserve his remaining property.

4. SAME—UNDUE INFLUENCE—SUSPICION.

Undue influence cannot be based upon mere suspicion: there must be direct or circumstantial evidence which tends to establish that actual improper influence was exercised; the fact that testator disposed of his property by will in favor of his intimate friends who were not shown to have requested such disposition was insufficient ground to establish undue influence.

5. SAME.

Evidence considered and *held*, insufficient to show that the beneficiaries of testator's will exercised any improper influence upon the decedent.

6. SAME.

Nor could undue influence be presumed or inferred from the fact that the testator devised a considerable portion of his estate to an intimate friend who had been his business adviser in relation to his property and the methods of preserving and disposing of the same, whose services, however, had been voluntary: no confidential relation existed which could give rise to a presumption that decedent's judgment was improperly affected. Opportunity alone is *held* not to warrant the inference of undue influence.

7. SAME—UNNATURAL DISPOSITION—OMISSION OF KIN.
   The fact that testator omitted from his will a sister from
   whom he had been estranged for a long period of time
   and whose children were remembered in the will was
   insufficient to require the court to submit the question of
   undue influence to the jury.

Error to Oakland; Smith, J. Submitted January 22, 1915. (Docket No. 72.) Decided March 18, 1915.

James R. Jones presented for probate the last will of Julien Williams, deceased. From an order admitting the same to probate Mary F. McKeand appealed to the circuit court. Judgment for appellee. Said appellant brings error. Affirmed.

*Perry & Lynch* and *Robert T. Speed,* for appellant.

*John H. Patterson, Sylvester Pheney,* and *Lloyd L. Axford,* for appellees.

BROOKE, C. J. On the 22d day of January, 1909, Julien Williams made the following will:

"I, Julien Williams, of the township of Waterford, county of Oakland and State of Michigan, being of sound disposing mind and memory, do make, publish and declare this my last will and testament in manner following:

"*First.* After the payment of all my just debts and funeral expenses, I give and devise to my nephew, Ferdinand W. Tilden, of Detroit, Michigan, his heirs and assigns, my farm of two hundred (200) acres situated in the township of Waterford, Oakland county, Michigan, in sections seventeen (17), eighteen (18), and eight (8), and I hope my said nephew will retain possession of the property, this old homestead, in memory of his grandfather and grandmother, Ferdinand and Phœbe Williams, who passed the best years of their lives there.

"I also give and devise to my said nephew, Ferdinand W. Tilden, his heirs and assigns, the following real estate in the city of Detroit, Wayne county and

State of Michigan, to wit: Lots numbered thirty-seven (37), thirty-eight (38), thirty-nine (39), and forty (40) of F. Williams subdivision of out lot numbered thirty-seven (37) of private claim number thirty (30).

"I also give and bequeath to the said Ferdinand W. Tilden the sum of one thousand ($1,000.00) dollars, to be used and expended by him in procuring a new monument of granite when needed to replace the marble one in the Drayton Plains cemetery and in caring for the graves of his grandfather and grandmother and his uncle Saxton, and also the graves of his uncles Ferdinand, Jr., and Theodore, on the bank of Williams Lake on the farm.

"I also give and bequeath to the said Ferdinand W. Tilden all my books, book cases, pictures, papers and household furniture, all my guns, revolvers and arms and the collection of Indian arrow heads and spear heads, &c., gathered by my father and self.

"It is my wish that my said nephew shall place this collection of guns, revolvers, arms and Indian relics, when he is done with them, in some public museum, where they can be kept together and protected. I also give to my said nephew my gold watch and some silver spoons and some gold, silver and copper specimens, as also my large iron safe.

"*Second.* I give and devise to my nephew McKinstry Burt, of Detroit, Michigan, son of my sister Flora, and to his heirs and assigns, lots one (1), two (2), and three (3) of F. Williams subdivision of out lot numbered twelve (12) in private claim number thirty (30) situated in the city of Detroit, Wayne county, Michigan.

"*Third.* I give and devise to Howard Davenport, of Pontiac, Michigan, son of my niece Flora Davenport, and to his heirs and assigns, my out lot of forty (40) acres in section six (6) situated in the township of Waterford, Oakland county, Michigan, and also my silver stem-winding watch which belonged to my brother Saxton.

"*Fourth.* I give and bequeath to my niece Flora Davenport or her heirs, the sum of two thousand ($2,000) dollars.

"*Fifth.* I give and bequeath to my esteemed cousin the Rt. Rev. G. Mott Williams, bishop of Marquette,

Michigan, two solid silver spoons, one table and one dessert spoon, heirlooms of the Mott and Williams families, bearing the initials respectively 'G. E. M.' and 'J. M. W.' believing that my said cousin will appreciate these relics more highly than any of my nearer relatives.

"*Sixth.* I give and devise to my two highly valued friends, James R. Jones and his wife, Alice Isabell Jones, of Holly, Oakland county, Michigan, and to their heirs and assigns, the following real estate situated in the city of Detroit, Wayne county, Michigan, to wit: Lot numbered four (4) of Williams subdivision of private claim number thirty (30) lying on the south side of Jefferson avenue, west, at the foot of Summit street, according to the plat thereof recorded in the office of the register of deeds for said Wayne county.

"I also give and devise to them lots numbered one (1), two (2), three (3), four (4), and five (5) of F. Williams subdivision of out lot numbered thirty-seven (37) of private claim number thirty (30) situated on the south side of Toledo avenue, in the city of Detroit, Wayne county, Michigan.

"In making the aforesaid bequests to my friends, Mr. and Mrs. James R. Jones, it seems proper for me to state, in justice to each of them, that neither of them have at any time mentioned the subject of my leaving them any property, nor have they exercised or attempted to exercise any influence over me to cause me to remember them in this my will, and our relations have always been of the most honorable character from beginning to end. But they have both shown me great kindness and true friendship for many years, during which time their house has been mostly my home.

"*Seventh.* I give and bequeath to my esteemed young friend, Miss Fay Maybee, daughter of my friend, John Maybee, of Independence, Oakland county, Michigan, the sum of $1,000.00.

"*Eighth.* I give and bequeath to my niece, Florence Cooper, or her heirs, the sum of two thousand ($2,000) dollars, West Branch, Michigan.

"*Ninth.* I give and bequeath to my old schoolmate and friend of my sister Flora, Mrs. Carrie Wilcox

Hoyt, of Pontiac, or her heirs, the sum of one thousand ($1,000) dollars.

"*Tenth.* I give and bequeath to my old friend, Mrs. Manuel R. Phillips, of Waterford, Oakland county, Michigan, the sum of five hundred ($500) dollars, in appreciation of her kindness and the good and faithful services she rendered my sisters Emily and Elizabeth and my mother during their last sickness.

"*Eleventh.* I give and bequeath to my friend Prof. Homer Robbins, of Ann Arbor, Michigan, son of my much esteemed friend Elmer Robbins, deceased, of Waterford, Michigan, the sum of five hundred ($500) dollars.

"*Twelfth.* I give and devise to my executors hereinafter named, and to their successor or successors, the following real estate in trust, and I hereby direct, authorize and empower them to sell and convey the same by good and sufficient deed or deeds as soon as it can be done by them, without sacrificing the property, and apply the proceeds derived therefrom in paying the debts and various legacies named in this instrument, such legacies are not to bear interest, to wit: Lots numbered four (4) to twenty-two (22), both inclusive, and the north twenty-one (21) feet of lot numbered twenty-three (23), all in F. Williams subdivision of out lot twelve (12) private claim number thirty (30), situated between Fort street and the Wabash R. R. track, on the west side of Ferdinand St., in the city of Detroit, Wayne county, Michigan. Also lot numbered five (5) of P. Williams subdivision of out lot thirty-one (31) of private claim number thirty (30), situated on the south side of Dix avenue, in the city of Detroit, Wayne county, Michigan.

"*Thirteenth.* All the rest, residue and remainder of my estate, both real and personal, of whatever kind and description, I give, devise and bequeath to Ferdinand W. Tilden, of Detroit, Michigan, and James R. Jones, of Holly, Michigan, in equal shares.

"And lastly I do nominate and appoint my friend James R. Jones, of Holly, Michigan, and my nephew Ferdinand W. Tilden, of Detroit, Michigan, the executors of this my last will and testament, hereby revoking all former wills by me made.

"In witness whereof, I have hereunto set my hand and seal this 22d day of January in the year of our Lord one thousand nine hundred and nine (1909).

[Signed] "JULIEN WILLIAMS. [L. S.]

"The foregoing instrument was at the date thereof signed, published and declared by the said Julien Williams to be his last will and testament, in the presence of us, who, at his request, and in his presence and in the presence of each other, have signed our names as witnesses thereto.

"CHARLES A. WILSON, Holly, Michigan.
"WILLIAM L. PLUMER, Holly, Michigan."

The will was admitted to probate in the probate court for Oakland county, and an appeal was taken to the circuit court, where its probate was contested by Mary F. McKeand, a sister of the testator, upon two grounds: Those of mental incompetency and undue influence.

A brief historical sketch of the testator will be found interesting, if not valuable. Julien Williams was born in 1840. He was the son of Ferdinand Williams and the grandson of John R. Williams, who in his lifetime was a man of considerable prominence in the city of Detroit. Testator's mother died in 1892, and his father in 1896. The testator was graduated from the legal department of the University of Michigan in 1863, shortly after married, and lived with his wife in the city of Detroit for a time. She, however, in a few years obtained a divorce from the testator, and thereafter he remained single. No children were born of this union. After his graduation he opened a law office in the city of Detroit, which he continued for about ten years. He did little legal business, except to look after the property interests of his father and mother, which seem to have been rather considerable. For a time after leaving Detroit, he lived with his mother at the village of Waterford, in Oakland county, and after her death he lived upon a farm that was owned by his father in the same

county. This farm consisted of about 200 acres, mostly covered by lake and forest. The record discloses that the testator was not a farmer, in the ordinary sense of the word; that he was fond of fishing and hunting, frequently going upon trips indulging in these pastimes. He lived a life of leisure for the most part, and seems to have been somewhat of a recluse, much of the time residing upon the farm in question and doing his own cooking. Upon the death of his mother, he seems to have inherited some property, and, when his father died testate in 1896, he inherited a very considerable estate from that source. The will of his father had been made some 30 or 40 years prior to his death. Under its terms Julien Williams claimed to take as residuary legatee all of his father's estate, except that specifically devised to others. A considerable portion of the estate seems to have been acquired by his father after the making of the will, and his older sister, Mary F. McKeand, took the view that such portion should descend to his heirs at law as undevised property. A contest was had between the testator and his sister Mrs. McKeand, in which this court determined that the contention of Mrs. McKeand was proper. This contest occurred between the years 1897 and 1899. It involved a considerable amount of expense for counsel, and seems to have engendered in the testator a very bitter feeling toward his sister Mrs. McKeand. He seems to have rested under the belief that he had been wrongfully deprived of a portion of the patrimony his father had intended him to enjoy. After the death of his father, the testator, who had been on fairly friendly terms with his sister up to that time, ceased all communication with her. The record discloses but one or two exceptions. In 1911 he appears to have sent her by her daughter's hand a jar of honey, and upon one other occasion is said to have written her a

note inviting her to visit him. This letter was not produced.

James R. Jones and his wife, who are devisees under the will of property of the appraised value of $18,600 and one-half of the residue of the estate, were friends and acquaintances of the testator for more than 30 years prior to his death, which occurred in November, 1912. For a time Jones was in business at the village of Waterford, and at an early day seems to have joined the testator in various hunting and fishing trips. They usually had a camping party once each year, and the testator and Jones and his wife were members of the party, which usually contained 15 or 20 persons. Later Jones moved to the village of Holly, where he likewise was engaged in business. The testator was a frequent and welcome visitor at his house, usually spending a day or two at a time. On one occasion he boarded with the Jones family for about three months, sleeping at home. Within the past 15 years, the testator, Jones, and his wife made three trips to Florida and one to the Pacific coast. On these occasions Jones paid the expenses of himself and wife, while the testator paid his own. The first services rendered by Jones to the testator seem to have been in connection with the will contest over the estate of the testator's father. The exact character of these services the record fails to disclose, but that such were rendered there is no question. About the year 1904 an arrangement was made between the testator and Jones, by the terms of which Jones agreed to assist the testator whenever required, in the care or disposition of his property, consisting principally of a large number of lots in the city of Detroit, in consideration of which the testator agreed to pay Jones more than he had been receiving up to that time, which appears to have been $65 to $75 per month. Under this arrangement, very many trans-

actions were handled on behalf of the testator in whole or in part by Jones. Lots were sold, taxes paid, rents collected, sidewalks cleaned, and many other services of like character were rendered by Jones for Williams from time to time from the date the arrangement was made up to the time Williams died. During this period Williams continued to live mostly alone upon his farm in Oakland county, while Jones and his wife lived in Holly. The business being carried on required a considerable correspondence between the parties, and many letters from Jones to the testator were produced by the contestant and offered in evidence. After a careful examination of these letters by the court below, they were excluded. Contestant likewise offered in evidence some 29 deeds bearing date during the years 1901 to 1912, inclusive. These deeds were made by the testator to various persons. They covered certain lots in the city of Detroit, and the aggregate consideration was in the neighborhood of $28,000. After considerable argument, the learned circuit judge likewise excluded these deeds. At the conclusion of the testimony received on behalf of contestant, and again after all the testimony introduced on both sides was in, counsel for proponent moved the court for a directed verdict upon the ground that no evidence had been introduced tending to show either incompetency on the part of the testator to make the will in question, or that the execution of said will had been induced by the exercise of undue influence on the part of James R. Jones or his wife. After full argument on said question, the learned trial judge withdrew from the consideration of the jury the question of undue influence, but permitted the case to go to the jury upon the ground of mental incompetency. The jury returned a verdict sustaining the will, and the case has been removed to this court on writ of error.

The errors assigned upon the admission or exclusion of testimony, with the exception of those relating to the letters and deeds, have been examined and are, we think, without merit. Those relating to the deeds and letters will be considered later. As bearing upon the question whether proponent's motion for a directed verdict should have been granted at the close of the testimony offered on behalf of contestant, it is pertinent to examine that testimony so far as it relates to the mental incompetency of the testator.

The first witness tendered by the contestant was James H. McDonald. He had known the testator since 1878, and had occupied an office with him for ten years. He testified that the testator was a very nervous man. That

"he could not stand and argue a question without getting all wrought up, and when he became wrought up he would jump up, and if the argument got pressing at all he would run off across the room, usually with an oath or strong words, something of that kind. Something that ought to finish the argument, as he thought, and it was impossible to get him down to close argument; that is to say, to get him down to the point of argument or anything of that sort. * * * I would say that his will power was not strong. * * * He would worry over what would, I think, seem to the ordinary man to be a trifle."

Mr. McDonald was asked the following question:

"Mr. McDonald, taking into account your knowledge of the deceased, Julien Williams, and your knowledge of the extent of his property and his relations, what would you say as to whether he had sufficient strength of mind at the time this instrument purports to have been executed to comprehend and appreciate his relation to his family and those who are or ought to be the objects of his bounty and his obligation to them, if any?

"*A.* The fact is, I don't think he would. Now, if I am able—"

On cross-examination the witness was interrogated

categorically as to whether he believed the testator knew his relatives and the amount of his property, and he testified that he believed he did, and finally:

"*Q*. Well, wouldn't he understand the whole of it?

"*A*. Well, I guess, as to the legal aspect of the whole of it, I think so."

On redirect examination, when asked by counsel for contestant why he had expressed an opinion against the mental competency of the testator, he answered:

"The reason I answered the question as I did was that Mr. Williams was so nervous by nature and was so easily agitated by very small and trifling things that I did not believe he could trust his own judgment even to decide between his relatives and friends what should be done with his property after his death."

The record discloses that Mr. McDonald appeared for the contestants in the probate court, and at the time of his examination was acting as advisor to the contestant, so that he hardly stands in the position of an unprejudiced witness.

The next witness, William Norton, testified that he had occasionally seen the testator in fits of anger. On one occasion testator became angry with him because the witness had failed to meet him at a certain train according to an agreement.

George H. Chapman testified to seeing the proponent in an outburst of passion some 12 years prior to the hearing, and at other times since. Upon one occasion, when testator became angry, he was being annoyed by some boys on Halloween.

Walter W. Whitfield, Jr., a neighbor of the testator, testified to an exhibition of passion on the part of testator on an occasion arising over the failure of the witness to secure for the testator some wire fencing which he had ordered and which did not arrive as early as testator believed it should.

William Tode testified to a disagreement with the

testator some six years ago, in the course of which he said the testator put his hand behind his back, the inference being that on the occasion in question the testator had threatened to shoot him, and on another occasion testator had said to him, "Why, damn you, I will shoot you." The trouble upon this occasion arose out of a charge made by the testator that the little boys of the witness had been meddling with the testator's mailbox.

George Tuller testified to an occasion in 1852, when the testator was about 12 years of age, that he drew a revolver or pistol and threatened to use it upon some boys who were annoying him.

William Tuller testified:

"He was very liable to fly into a passion. He frequently did. All the time that I knew him."

Dr. Frederick Thompson, a nephew of the testator, testified:

"He would stand no opposition. If any opposition was made to my uncle he would fly into a rage, and very likely after expressing himself in a vigorous manner he would get out, take his hat, and go away. In expressing himself in that vigorous manner, the character of his language was profane and abusive in the extreme, and he was fluent. He grew worse as he grew older, in that respect. If not opposed in any way, he was a very agreeable person. He was very liable to—very susceptible to flattery. During my acquaintance with him and experience with him he became angry at me a very great many times. He was very nervous. He could not sit down and talk a few minutes with you without—if there was the slightest difference in the argument he couldn't sit down and argue it out and come to the end by mutual agreement. He couldn't stand it. He would get up if things grew tedious and would move."

This witness expressed the opinion that the testator's mental condition was such that he did not know his relatives and comprehend their claims, if any,

upon him.   On cross-examination he testified in part as follows:

"*Q.* Don't you think that Mr. Williams in 1909 knew who his relatives were?
"*A.* By name.
"*Q.* Don't you think he knew how many he had?
"*A.* Perhaps in number he could recall; very likely.
"*Q.* You don't think he knew your mother was his only surviving sister?
"*A.* I think he did.
"*Q.* Don't you think that he appreciated the fact that McKinstry Burt was the only son of his deceased sister?
"*A.* Very likely.
"*Q.* Don't you think that he knew that Ferdinand Tilden was his nephew?
"*A.* I do.
"*Q.* And that he was the son of his sister, Mrs. Tilden, who is dead?
"*A.* Yes, sir.
"*Q.* Don't you think that he knew also that Mrs. Cooper was his niece?
"*A.* I think very likely he did.
"*Q.* Don't you think he had mind enough to retain in his memory the fact that these persons I have named were his only relatives who would be his heirs at law, without a will?
"*A.* It is hard work to answer without a qualification, but I think very likely he did.
"*Q.* You had no doubt but what your uncle Julien Williams knew that Mrs. Davenport was your sister?
"*A.* No, I don't.
"*Q.* And that Howard Davenport was her son?
"*A.* Yes.
"*Q.* Do you have any doubt but what he knew what property he had when he made that will?
"*A.* I think he very likely did.
"*Q.* Do you think that your uncle knew that your mother had received property from her father and uncle James Mott Williams?
"*A.* He did.
"*Q.* Do you think that he had mind enough to appreciate the fact that you and Mrs. Cooper and Mrs. Burt received property from J. Mott Williams?

"*A.* Yes, sir."

Mrs. Nellie Woodruff had lived upon the Williams farm for 7½ years, in a part of the house, the other portion of which was occupied by Williams. She did some of the household work for Williams, and occasionally cooked for him. She expressed no opinion as to the competency of the testator to make the will in question, but testified that the testator objected to obtaining his milk from a certain family, assigning as a reason that he was afraid he would be poisoned.

Mrs. Mary F. McKeand testified that her brother, the testator, was always fretful and wanted his own way in everything and that he frequently indulged in threats toward the person against whom he had his anger. She expressed no opinion upon the question of competency.

Her daughter, Mrs. Flora Davenport, testified:

"My uncle was very nervous, and he would get angry very easily. When angry he was generally very profane, and was not very particular what he said to you."

On cross-examination this witness testified that she visited her uncle in either 1910 or 1911 and had a considerable conversation with him; that she stayed about three-quarters of an hour.

"*Q.* Your uncle seemed to be all right mentally when you saw him on that occasion at the farm, didn't he?

"*A.* As far as I know.

"*Q.* You didn't notice anything wrong with him then?

"*A.* No.

"*Q.* You never noticed anything wrong with him mentally?

"*A.* Well, no, I can't say that I ever have."

Albert Davenport, husband of Flora Davenport, testified that after 1895 the correspondence between the testator and the wife of witness had ceased. On direct examination he expressed no opinion as to the

mental capacity of the testator. On cross-examination he said:

"The last time I had any conversation with Julien Williams I could not say that I noticed anything wrong with his mind or his mental capacity."

Mrs. Carrie Brazington, who lived for a time in the same house with the testator, said of testator:

"Why, he was very pleasant, and sometimes he was not so pleasant.  *   *   *   He didn't have anything to do with us, nor wouldn't speak to us at all until he got over his spell, and all at once he would come around and be all right and be pleasant and seem to be all right, but he never would say anything."

She detailed circumstances of a demand made by the testator upon her for an old cook stove which she had understood had been given to her by the testator.

George Richardson testified that nine years before the trial he was fishing on the lake upon testator's farm. He said:

"I was on the shore, and he was in a boat. He told me to get off and stay off. I hollered and told him who I was. He didn't make any reply. I got off.

"Q. Was he angry at that time, whether he acted angry?

"A. Why he talked quite loud, as though he might be angry. Afterwards I received a printed notice, a newspaper clipping. It was in regard to trespassing on his place."

Daniel Kinney testified of an occasion when he, in company with two others, were fishing upon the lake, when the testator ordered them off:

"On that occasion from where he stood on the bank he hollered out. He must have been 25 or 30 rods from me at that time. I was on the part of the lake covered by his deed, I think. He hollered to us to get off from there, and he up and shot twice, and he didn't have any more time to say anything. I suppose he shot at us. Anyway, he came out on that point and came on the bank and told us to get off, and we didn't have

time to turn around before he shot. I don't know whether he shot at us or not. I don't know what direction he fired exactly. I know we moved right away, because he said he would go up and get his '44' if we didn't move off, and of course we moved."

Alvin Wright gave testimony tending to show that the testator, while hunting in the north woods, wore a red cloak and red hat.

McKinstry Burt, son of Flora Williams Burt, a niece of testator, testified to seeing testator in fits of anger; that the testator was very nervous and eccentric. In his direct examination the following testimony:

"*Q.* State from your knowledge of Julien Williams and your acquaintance with him, since you came back from New York, whether in your opinion, since you have been acquainted with him, he has had sufficient mental ability to know his relatives and comprehend their claims, if any, upon his bounty?
"*A.* Mental ability?
"*Q.* Yes.
"*A.* I think so.
"*Q.* You do think so?
"*A.* He knew his relatives.
"*Q.* I didn't ask you that. Now you may state from your knowledge of Julien Williams and your acquaintance with him, since you came back from New York, whether in your opinion, since you have been acquainted with him, he has had sufficient mental ability to know his relatives and comprehend their claims, if any, upon his bounty?
"*A.* No, sir."

This witness on cross-examination, when questioned categorically, gave it as his opinion that his uncle knew the extent of his property and the names of his relatives:

"*Q.* Well, I will ask you this question: If Mr. Williams had made a will, conveying by the terms of that will to members of his own family, would you have any hesitancy to say that he was mentally competent to make it? Answer that 'Yes' or 'No.'

"*A*. Yes, sir.

"*Q*. You would have?

"*A*. Yes, sir.

"*Q*. Is that because you think that he did not have mind enough to know who his relatives were?

"*A*. (witness hesitating). Well, I can't say yes or no; may I say anything else?

"*Mr. Perry:* If he cannot answer it 'Yes' or 'No,' I don't think he is obliged to say 'Yes' or 'No.'

"*The Court:* There isn't any other answer he could make to that, except one that is responsive, and Mr. Perry will give you an opportunity to explain.

"*A*. I say 'yes' on the assumption that the conditions are the same as they are now.   *   *   *

"*Q*. If Mr. Williams had made a will, conveying by the terms of that will to members of his own family, would you have any hesitancy to say that he was mentally competent to make it? Answer that 'Yes' or 'No.'

"*A*. That answer—I think that former question and answer I want to change; if he left it to his relatives, I would have thought he had mind enough."

Aside from the documentary evidence offered, the foregoing constitutes practically all of the evidence introduced on behalf of the contestants bearing upon the question of competency. We have set out the substance of the testimony thus at large in order that it may be apparent upon what our conclusions hereinafter stated are based. Of all these witnesses, it is to be noted that but three expressed the opinion that the testator was incompetent to execute the will in question, in 1909, when it was made. The first of these was McDonald; the second is McKinstry Burt, a nephew and devisee of $5,500 worth of property in the will; and the third is Dr. Frederick Thompson, son of Mrs. McKeand, testator's sister. The substance of the testimony of each of these witnesses is set out *supra*, so far as it affects the question under consideration. In our opinion a careful reading of the testimony of each of these witnesses tends rather to establish the mental competency of the testator than to

bring it in question. Taking their testimony together with that of all the other witnesses who, while not expressing an opinion, testified to acts from which an inference of incompetency is sought to be drawn, we think it should be held that the most that can be said is that the testator is described as a person of education and intelligence above the average; somewhat eccentric in his habits and method of life; somewhat nervous and irritable; and upon occasions subject to fits of anger, and extravagant, and perhaps profane expression.

No one of these characteristics, nor all of them, taken together, no matter how definitely established, are sufficient under the law of this State to stamp a man, otherwise of sound mind, as mentally incompetent to make a valid disposition of his estate by will. In reaching this conclusion we have, as we are bound to do, given the testimony offered on behalf of the contestant its greatest probative force, and have not considered the testimony offered on behalf of the proponents of upwards of 20 witnesses, men of standing in the community, who had known the testator for a great many years, and who asserted without reservation that at the time the will was executed, in their opinion, he was mentally competent.

We next come to the question of the exclusion of the deeds. Counsel for contestant claimed the right to introduce said deeds, for the purpose of showing that in the last 10 or 12 years of the life of the testator he had disposed of about $28,000 worth of his real estate, and at the time of his death this money had practically disappeared. The argument sought to be based upon this showing was that the testator was a bad business man and had squandered a very considerable portion of his patrimony. While excluding the deeds in question, the learned trial judge offered to permit contestant to show the details of any trans-

action in which it was claimed the testator had made a bad or foolish bargain, or any instance in which the testator had foolishly spent or squandered his money. Neither of these offers was accepted by the contestant. The record fairly discloses that the testator was possessed of a considerable amount of Detroit real estate, which was in the main, if not wholly, unproductive, and that he had no fixed income, except for a few years a small amount received from the sale of gravel taken from one of the Detroit lots. This amount seems to have been inconsiderable. It is apparent that to preserve the body of his estate, pay taxes, and exist himself, it would become necessary for him from time to time to sell some portion of it. This he appears to have done. There is nothing in the record tending to show, nor is there any offer of proof to the effect, that the testator sold more of his estate than was necessary for his decent maintenance and for the preservation of what he retained.

While we have held that good business ability is evidence of mental capacity to be properly considered in will cases, we have never held that, because a testator had not in his possession at death the purchase price of property sold by him during his lifetime, that fact might be considered as tending to show incapacity to make a will. We are of opinion that the deeds were properly excluded.

It is strongly urged by counsel for contestant that reversible error was committed by the learned trial judge in withdrawing from the jury consideration of the question of undue influence upon the testator's mind exercised by Mr. and Mrs. Jones. In this connection it is proper to state that there is not a word of affirmative testimony in the record showing or tending to show that either Mr. or Mrs. Jones had at any time asked the testator to leave them, or either of them, any portion of his property. Both were placed

upon the stand by counsel for the proponents, and both categorically denied that they had ever sought to influence the testator either duly or unduly. An inference of such undue influence is sought to be drawn by counsel for contestant from several sources. They say that the testator was very nervous, did very little business, and that his will power was weak. They point to the relations between the testator and Mr. and Mrs. Jones, and argue that both had the opportunity to exercise undue influence over the mind of the testator, and that the result shows that they did exercise such influence. They urge that the clause in the will in which the testator distinctly negatived any such influence on the part of Mr. and Mrs. Jones, and recited that the relations existing between himself and them had always been of the most honorable character, "is capable of a construction that would lead to an inference of undue influence and furnish another circumstance to be weighed by the jury in determining that question."

We do not lose sight of the fact that undue influence need not be proven by direct evidence, but can be established by indirect and circumstantial evidence. This principle has been laid down in many Michigan cases, the last two of which are *In re Loree's Estate,* 158 Mich. 372 (122 N. W. 623), and *In re Du Bois' Estate,* 164 Mich. 8 (128 N. W. 1092). But we are of opinion that the contestant must introduce evidence from which inferences may fairly be drawn that such influence was exercised. The fact that Jones and his wife were made beneficiaries under the will is not alone sufficient nor is contestant aided by the fact that it is shown that testator and Jones and his wife were intimate friends for many years. The latter consideration serves rather to show why Jones and his wife became objects of the testator's bounty. *Maynard* v. *Vinton,* 59 Mich. 139 (26 N. W. 401, 60 Am. Rep.

276); *Severance* v. *Severance,* 90 Mich. 417 (52 N.
W. 292); *Lamb* v. *Lippincott,* 115 Mich. 611 (73 N.
W. 887). Opportunity alone cannot give rise to a
valid inference that undue influence has been exer-
cised. *In re Shanahan's Estate,* 176 Mich. 137 (142
N. W. 573); *In re Foerster's Estate,* 177 Mich. 574
(143 N. W. 616).

The record discloses the fact that the testator made
an earlier will on January 27, 1900, almost exactly
nine years prior to the date of the will in question.
In that will he devised to Jones and his wife certain
real estate, or in lieu thereof the sum of $30,000. The
will itself was placed in the custody of Jones by the
testator, with injunction to read it. This Jones did
in the presence of his wife, and, so far as he knew,
no other will had been made. Although not material,
it seems that the provision made for Jones and his
wife in the latter will is not so liberal as that in the
earlier one. The conduct of Jones and his wife toward
the testator during the last 12 years of his life must
be viewed in the light of their knowledge of the fact
that they were to be beneficiaries under the last will
of the testator at his death. A very succinct and ex-
haustive discussion of the question of undue influence
is expressed in the case of *Ginter* v. *Ginter,* 79 Kan.
721 (101 Pac. 634, 22 L. R. A. [N. S.] 1024), as fol-
lows:

"To vitiate a will there must be more than influence.
It must be undue influence. To be classed as 'undue,'
influence must place the testator in the attitude of say-
ing: 'It is not my will, but I must do it.' He must
act under such coercion, compulsion, or constraint that
his own free agency is destroyed. The will or the
provisions assailed does not truly proceed from him.
He becomes the tutored instrument of a dominating
mind, which dictates to him what he shall do, compels
him to adopt its will instead of exercising his own,
and, by overcoming his power of resistance, im-

pels him to do what he would not have done had he been free from its control. A testator's favor expressed in a will may be won by devoted attachment, self-sacrificing kindness, and the beneficent ministrations of friendship and love. These influences are not undue. We expect partiality to attend them. They bring preferment as their natural reward, and they do not become unrighteous, although they establish a general ascendancy over the testator, leading him to find comfort and pleasure in gratifying the wishes and desires of the person exercising them. Other less worthy influences may make equally strong appeals and may result in the same general dominion and still be sufferable in contemplation of the law. Influences to induce testamentary disposition may be specific and direct without becoming undue. It is not improper to advise, to persuade, to solicit, to importune, to entreat, and to implore. Hopes and fears and even prejudices may be moved. Appeals may be made to vanity and to pride; to the sense of justice and to the obligations of duty; to ties of friendship, of affection, and of kindred; to the sentiment of gratitude; to pity for distress and destitution. It is not enough that the testator's convictions be brought into harmony with that of another by such means. His views may be radically changed, but so long as he is not overborne and rendered incapable of acting finally upon his own motives, so long as he remains a free agent, his choice of a course is his own choice, and the will is his will, and not that of another. * * * 'It is not the influence of friendship or affection that can be complained of, nor the influence of argument or entreaty, nor the impression made by kindness or prudence, nor even the effect wrought by servile compliance or mean endurance of wrong. It must be something which destroys free agency. Motives of almost every conceivable kind may be offered, and if the mind of the agent, free to reject or adopt the motives, yields its assent, the act is the act of the agent.' *Means* v. *Means*, 5 Strob. (S. C.) 167, 192.

"'In order to cause a will or deed to be set aside on the ground of fraud and undue influence, it must be established to the satisfaction of the court that the party making it had no free will, but stood *in vinculis*.'

*Conley* v. *Nailor*, 118 U. S. 127, 6 Sup. Ct. 1001.

" 'Upon contest of [a] will for undue influence, the question is "whether the will is the will of the testator, or that of another." It is not influence that vitiates, but undue influence; and it must go to the extent of depriving the testator of his free agency, and amount to moral coercion which he is unable to resist.' *Peery* v. *Peery*, 94 Tenn. 328 (29 S. W. 1).

" 'The influence which the law denominates undue, and which vitiates a will executed under it, must amount to moral or physical coercion, destroying free agency, and constraining its subject to do that which, but for it, he would not do.' *Westcott* v. *Sheppard*, 51 N. J. Eq. 315 (25 Atl. 254, 30 Atl. 428).

" 'Undue influence, such as will invalidate a will, must be something which destroys the free agency of the testator at the time when the instrument is made, and which, in effect, substitutes the will of another for that of the testator. It may be exercised through threats, fraud, importunity, or by the silent, resistless power which the strong often exercise over the weak and infirm; but, however exercised, it must, in order to avoid a will, destroy the free agency of the testator at the time it was made, so that the instrument in fact expresses the mind and intent of some one else, and not his own.' *Schmidt* v. *Schmidt*, 47 Minn. 451 (50 N. W. 598)."

The record before us fails to establish the power of Jones and his wife to unduly influence the testator, which, even if shown, would be insufficient. *Maynard* v. *Vinton*, 59 Mich. 139 (26 N. W. 401, 60 Am. Rep. 276). The most that can be said of the evidence in the case at bar is that, through constant association and friendly acts, Jones and his wife had the opportunity to exercise an unlawful and undue influence over the testator. That they did so is not to be inferred from the evidence adduced. Indeed, the record discloses that, for many years prior to the death of the testator, Jones devoted a very considerable portion of his time to the interests of the testator without compensation, but under the assurance that he

would ultimately be paid more than he had theretofore been earning. Mere suspicion is not sufficient, as was said by the Supreme Court of the United States in *Beyer* v. *Le Fevre,* 186 U. S. 114, 22 Sup. Ct. 765:

· "The will of a person found to be possessed of sound mind and memory is not to be set aside on evidence tending to show only a possibility or suspicion of undue influence. The expressed intentions of the testator should not be thwarted without clear reason therefor."

Under our view of the case, the question of the admissibility of the letters from Jones to the testator is unimportant. These letters have all been read with care. They show that during a number of years Jones was very active in and about the transaction of the testator's business. They indicate, perhaps, that the testator relied upon the advice of Jones in his business affairs. They express on the part of the writer a very sincere friendship for the testator. This friendship may have been real or assumed, but in any event, if such expression had any effect upon the testamentary activity of Williams, it was not such influence as the law, under the decisions, characterizes as undue. It should be observed, too, that these letters were all written, with the exception of four, which were dated in 1899, subsequent to the execution of the earlier will, and at a time when Jones knew that he was to become the object of the testator's bounty.

The claim made on behalf of contestant that this case should be viewed upon the assumption that Jones acted in a fiduciary capacity toward the testator, such as a physician toward his patient, a spiritual advisor toward his penitent, or a lawyer toward his client, is, in our opinion, untenable. The matters in which the testator sought, and often followed, the advice of Jones were those of an ordinary business character. They related for the most part to the price to be

asked for real estate, the conditions to be inserted in the contracts, and perhaps the terms of leases. It is not shown nor intimated that Jones ever profited to the extent of a penny in any transaction in which he gave advice to the testator, nor is it shown that either he or Mrs. Jones had anything to do with the preparation of the will which was holographic, as was also the one of earlier date. These facts clearly distinguish the case at bar from *In re McMaster's Estate*, 163 Mich. 210 (128 N. W. 259), cited and relied upon by appellant. To hold that a friend or neighbor could not give such advice to another without being charged with the exercise of undue influence under a presumption of fact growing out of the relationship would be to extend the rule beyond warrant of law.

It is said that the will in question is an unnatural one. With this assertion we cannot agree. The testator left an estate of about $52,000. In his will he remembered every one of his legal heirs, with the single exception of Mary F. McKeand. Bequests of considerable sums were made to her daughter and grandson. That the testator should have failed to devise or bequeath anything to his sister is, we think, most natural, under the situation disclosed in this case. In the first place, his sister was ten years his senior, and at the time the will was drawn was upwards of 80 years of age. Then, too, the testator had become estranged from his sister, and his mind was embittered toward her, because of her activity in the contest against him over the estate of his father.

A careful examination of this entire record convinces us that the learned trial judge was correct in withdrawing from the jury a consideration of the question of undue influence, and was in error in submitting to the jury the question of mental incompetency. It therefore becomes unimportant to con-

sider the assignments of error based upon the court's refusal to charge as requested and upon the charge as given.

The judgment is affirmed.

MCALVAY, KUHN, STONE, OSTRANDER, BIRD, MOORE, and STEERE, JJ., concurred.