*In re* LUKASZEWSKI'S ESTATE.

WILLS — UNDUE INFLUENCE — CONFLICTING TESTIMONY—QUESTION FOR JURY—GREAT WEIGHT OF EVIDENCE—NON OBSTANTE VEREDICTO.

In reviewing a judgment in favor of contestant in a will contest case, on the ground of undue influence, where the Supreme Court is convinced that the verdict was against the great weight of the evidence, it will be reversed, although it cannot be said that the court below was in error in submitting the case to the jury under the conflicting testimony.

Error to Wayne; Goff (John H.), J.    Submitted

January 9, 1923.    (Docket No. 55.)    Decided July 19, 1923.    Rehearing denied October 1, 1923.

Joseph Lukaszewski and others presented for probate the last will of Stanislaus J. Lukaszewski, deceased.    The will was allowed in the probate court, and Stephanie Lukaszewski appealed to the circuit court.    Judgment for contestant.    Proponents bring error.    Reversed.

*Charles Bowles,* for appellants.

*Clarence P. Milligan,* for appellee.

STEERE, J.    This case is a contest over the will of Dr. Stanislaus J. Lukaszewski, deceased, a Polish physician who practiced his profession in Detroit for 10 years or more and died on the 11th day of September, 1920.    At the time of his death he was 47 years of age.    He was survived by various relatives and Stephanie Lukaszewski, his wife, to whom he had been married two years and with whom he was not living at the time of his death.    She was 23 years of age at the time this case was heard in 1922.    When his will was presented to the probate court of Wayne county for probation she appeared and contested it unsuccessfully.    She then appealed to the circuit court where the case was tried before a jury and the will held invalid on the ground of undue influence. Appellants bring the case here for review upon 11 assignments of error which center to the two propositions that there was no evidence of undue influence upon which to submit the case to the jury, and, under the assumption that there was, the verdict was against the great weight of evidence.    The grounds of invalidity claimed for contestant were mental incompetency and undue influence.    At conclusion of the proofs counsel for proponents moved for a directed

verdict which the court rightly granted as to mental incompetency, but submitted the question of undue influence to the jury under an able charge of which no complaint is made, reserving decision on that feature of the motion until after verdict. Proponents unsuccessfully moved for judgment *non obstante*, and after judgment was entered on the verdict made motion for a new trial on the ground, among others, that the verdict was against the great weight of evidence, which was denied.

No special questions of law are involved. The will, dated July 20, 1920, is a simple, concise, well drafted instrument legally executed, which gives without restrictions $1,500 to contestant, to two "faithful servants" $500 each, $1,000 each to the Detroit order of Elks, the Detroit Chemical Laboratory and deceased's stepmother, $2,000 to his stepbrother, $2,000 to his attorney who had professionally attended to deceased's legal business for some years and drew his will, and $3,000 to "my friend" John C. Dysarz, Jr., who it is claimed by contestant mainly exerted the undue influence charged. The residue of deceased's estate, after paying his debts, funeral expenses and the specific legacies provided, was divided between his two brothers and two sisters.

Regardless of where blame rested, the marriage between testator and contestant proved an unhappy one. Her home was in Cleveland where she resided with her parents and was employed in the courthouse as a stenographer. He met her in Detroit following a concert at which she sang and later visited her occasionally in Cleveland. After their marriage he took her to his home in Detroit, and almost from the beginning their marriage relations appear to have proved uncongenial. She accused him of ill-treatment and cruelty, while he accused her of unseemly conduct and undue familiarity with a Polish priest of Detroit.

These disagreements resulted in their separating on three occasions within a year, the third being final, after which she neither wrote to nor saw him again during his lifetime.    Their final separation was on October 30, 1919, when she returned to Cleveland where she has since resided.    On November 3, 1919, she filed a bill for separate maintenance on the ground of extreme cruelty, including accusing her of unchaste conduct and "running around with other men."    On December 22, 1919, he filed an answer in denial and explanation with a cross-bill charging her with ill-treatment of him personally and misconduct in various ways, including unseemly association with a Polish priest named Kolkiewicz which became a matter of neighborhood gossip to his disgrace and humiliation in the eyes of his friends and acquaintances, asking a decree of absolute divorce on the grounds of extreme cruelty.    On January 4, 1920, he began an action by *capias* against Sylvester Kolkiewicz, the priest with whom he accused her of improper association, to recover damages for alienation of his wife's affections. On April 24, 1920, he filed in her suit against him an amended cross-bill charging her with adultery. Amendments to pleadings in those cases with increased vehemence of crimination and recrimination terminated so far as disclosed here on June 9, 1920, but testator died before either of the cases reached a trial or final hearing.

This ample record is replete with written and oral evidence relating to the issues involved in the cases pending when testator died, to a point where as this case ran the trial court was seemingly confronted with a consolidation of the two cases begun before testator died with a contest of his will after his death. That the unkindly feeling engendered between testator and his wife by the litigation pending at the time he made his will had a bearing on his action in framing

it as he did may be conceded; but if he acted on his own initiative under the free exercise of his own volition he had the legal right to make such will as he saw fit.   His will was not an unnatural one under the circumstances, nor is it claimed to have been except in his failure to provide more liberally for his wife.    They were then living apart after a final separation.   They had no children.   Divorce proceedings were then pending between them on her initiative.   She was standing on her legal rights under their contract of marriage and making serious charges against him, reciprocated by counter charges on his part against her.   He was stricken with a fatal disease when he made his will and presumptively knew that by it he could not divest her of the interest in his estate which the law gave her if she chose not to take under the will.

The undisputed testimony shows that testator was an educated man of keen and active mind, with a well-established practice in his profession largely but not entirely amongst people of his own nationality.   He was recognized as a man of ability and an able physician by members of his own profession.    Five physicians sworn by appellant testified that he was a well-educated physician, with a clear and apparently independent mind.    Dr. Rowland E. Loucks, a physician of 20 years' practice in Detroit, testified to acquaintance with testator since 1914, that he knew him well and treated him professionally for some time, the immediate cause of his death being pneumonia to which he was rendered very susceptible by an insidious, fatal disease called leukæmia impairing the spleen and other parts of the body by having too many white corpuscles in the blood; that he was well informed on things•in general, discussed medical subjects with him, understood the nature of his affliction, "was right up to date on many things" and mentally

perfectly normal in every way.    Dr. Stevens, who had practiced in Detroit 33 years and was one of his physicians, testified that while attending him they discussed at times business, social and medical subjects, including testator's ailment from a scientific standpoint, that his affliction did not affect his mind, which was in all respects perfectly clear and normal.    Dr. J. B. Kennedy, who had practiced his profession in Detroit for 36 years, had himself been cared for professionally by testator in 1917, found him "a well-informed gentleman," with good mentality, and testified in part as follows:

"*Q.* Did you find that Dr. Lukaszewski was a man who could be easily influenced?

"*A.* No, I don't think so.    I think he was a man who would have a conviction and he would have the courage of that conviction.

"*Q.* An independent will and thought of his own?

"*A.* Yes, I think he was a strictly independent thinker.

"*Q.* You found him to be that way in your association with him?

"*A.* Yes, sir; and he was a man of good judgment; I once had him take care of myself when I had three broken ribs."

Dysarz, to whose undue influence the will in question is imputed by contestant, had known testator since 1914, was of the same nationality but about 13 years younger, was regularly employed in some clerical capacity in the Wayne county probate office, had been admitted to the bar but owing to his employment, as he states, did not engage in general practice although he sometimes did work in that line which did not interfere with the hours of his employment.

Some years before his death testator had become interested in the development of a motor heater for automobiles which he had invented and secured patents for.    He organized a corporation to manufacture it,

of which he was president, and devoted considerable money and time in apparently futile efforts to make it a success. The company was still in existence but dormant when he died. In that connection he employed Dysarz for several years to do work for him during after hours, at an agreed compensation of $600 a year. Dysarz was for a time secretary of the corporation. Of the nature of his services he states:

"If there was an agreement I would draw that; I was supposed to attend any matter that needed my attention; sometimes I would get excused from the office in the afternoon, but not very often; I did not want this matter to conflict with my duties as a clerk in the probate office, so all my work was done either holidays, Sundays, and after work, and most of the work was done at his office; he was the president, and the agreement was that any time he called me I was supposed to be ready to be there."

Dysarz was not present when testator's will was prepared or executed. He testified positively, with no evidence to the contrary, that he had no knowledge of it until some time after it was made, when one day he was in the doctor's office the latter showed him a copy, and that the $3,000 left him was less than the amount due him for services.

The priest Kolkiewicz was pastor of a Polish Catholic church in Detroit, and had been a friend and welcome guest at testator's house before he was married and for some time after. He was deposed from his pastorate by the bishop of the diocese at the solicitation of his parishioners because of charged moral delinquencies, in which contestant figured conspicuously if the testimony of certain witnesses is true as to her conduct at testator's house and elsewhere. Dysarz denies ever saying anything to testator derogatory of his wife or that would prejudice him against her, but if he did, the information which

came to testator's knowledge from other sources was far more incriminating than anything contestant claimed he said against her to any one. The following reflections by the trial court in disposing of the claim of mental incapacity in certain aspects truthfully touches with equal force the claim of undue influence:

"The overwhelming evidence in the case, without contradiction, because there could not be any contradiction, was that he was told by a large number of friends, or shown by affidavits in regard to the conduct of his wife. It does not follow at all if she was not guilty that that would make him an insane person, or subject to an insane delusion. She is not on trial here for adultery, and neither is Father Kolkiewicz here on trial; neither one of them is on trial. The decision of this case does not affect them, it does not decide any status between them at all. This man, Dr. Lukaszewski, had a right to exercise his judgment and it was his duty when affidavits or statements were made to him by his friends or neighbors in regard to the conduct of his wife, if he was any man at all, he would pay attention to those charges, and if he made error in his judgment and decided wrong, is no proof that he was insane or a subject of insane delusions. It does not blast anybody's reputation or any thing of that kind, because he might have been mistaken, and that is immaterial in this case; he had plenty of facts to act upon; and if it has been shown here conclusively that there was nothing wrong between Father Kolkiewicz and the contestant, that would not prove him to be subject to a delusion in any way."

The value of testator's estate is not shown. In contestant's bill for separate maintenance she alleged he owned a block on Chene and Kirby avenues worth $50,000 and a patent for automobile heaters worth $20,000. In his sworn answer he alleged that while his patent if properly financed would be valuable, the company organized to promote it was hopelessly involved financially and unable to manufacture the

heaters, admitted that the block on Chene and Kirby avenues was approximately of the value claimed, but said prior to their marriage he was heavily involved financially and the title to that real estate was held by a creditor as security for indebtedness approximating $40,000 which he saw no likelihood of being able to meet. While the value of his estate is of little significance here, except as it might influence the testimony of interested witnesses, the evidence indicates he lived liberally on a plane commensurate with his standing in his profession, maintaining an establishment with a housekeeper, chauffeur and other employees, and was also under additional expenses in an unsuccessful endeavor to exploit his invention, which involved him in debt. Various claims of creditors for money borrowed and unmet obligations to employees were filed against his estate, including a claim for $1,700 by his housekeeper, Marya Piesniewski, to whom he left $500 in his will. Dysarz, who was appointed one of the executors of the will, objected to the amount of her claim which was reduced by the commissioners on claims to $200. She was contestant's strongest witness as to words and conduct of Dysarz claimed to show undue influence. She incidentally stated that she had also worked part of the time for Father Kolkiewicz and prepared dinner at his house when testator and his wife were expected there as guests. Her not always lucid testimony through an interpreter, like that of several other witnesses in the case of her mentality and type, was tuned to a reckless partisan superlative far from convincing. A sample of hers is as follows:

"*A.* Yes, I heard Mr. Dysarz speak to Dr. Lukaszewski that he must work there so that Mrs. Lukaszewski must leave the house.

"*The Court:* Who said that?

"*A.* Mr. Dysarz to Dr. Lukaszewski, he said that he must act so.

"*Q*. That who must act so?

"*Interpreter:* Mr. Dysarz.

"*Q*. What did Mr. Dysarz say?

"*A*. Mr. Dysarz told Dr. Lukaszewski and told me that I may call Mrs. Lukaszewski a monkey and treat her like a monkey and nothing would happen to me.

"*Q*. Was anything said with reference as to whether or not she should be given anything to eat—by John Dysarz?

"*A*. It was said that she was not supposed to get anything to eat.

"*Q*. Who said that?

"*A*. Mr. Dysarz did.

"*Q*. Who did he say that to?

"*A*. To the Doctor."

While not prepared to hold that the trial court erred in finding there was conflicting testimony upon the issue submitted sufficient to carry the case to the jury, we are of opinion that the verdict rendered was against the overwhelming weight of convincing evidence, both oral and written. It would profit nothing to compare and review in detail the testimony of the various witnesses called by the respective parties. The logic of the situation upon that issue as disclosed by the weight of consistent, convincing evidence, tested in the light of the rules of law as to proof of undue influence required to defeat a will (*In re Williams' Estate*, 185 Mich. 97), leads to the conviction that plaintiff has failed to sustain the burden of proof upon that proposition.

The judgment is reversed, with costs to appellants, and a new trial granted.

WIEST, C. J., and FELLOWS, MCDONALD, CLARK, BIRD, SHARPE, and MOORE, JJ., concurred.