*In re* McINTYRE'S ESTATE.

DOYLE *v.* CLANCY.

1. WILLS—EVIDENCE—UNDUE INFLUENCE.
   In a proceeding for the probate of a will, opposed by nephews and nieces of the testatrix, who devised the greater part of her estate to charitable institutions of the Catholic church, evidence reviewed, and *held*, insufficient to present a question of fact on the issue of undue influence by her religious advisers.

2. SAME—SUFFICIENCY OF PROOF.
   Undue influence, to vitiate a will, should be more than influence, and must coerce the testator against her will, causing her action to be under compulsion or restraint such as to affect or destroy her free agency.

3. SAME—PROOF—CIRCUMSTANTIAL EVIDENCE.
   It need not be proved by direct evidence, but can be established by indirect proofs or circumstantial evidence from which it may be inferred that such influence was exerted.

Error to Kent; McDonald, J. Submitted April 7, 1916. (Docket No. 37.) Decided September 27, 1916.

Emanuel J. Doyle presented for probate the last will of Ann McIntyre, deceased. From an order admitting the same to probate, Charles Clancy and others appealed to the circuit court. Judgment for proponent on a directed verdict sustaining said will in part and for contestants on question submitted to the jury. Proponent brings error. Affirmed as to directed verdict and reversed as to balance.

*Emanuel J. Doyle* (*Jacob Kleinhans, M. L. Dunham, Willard F. Keeney,* and *Thomas A. E. Weadock,* of counsel), for appellant.

193 Mich.—17.

*Lombard, Hext & Washburn* and *Charles E. Ward,* for appellees.

MOORE, J.   October 9, 1908, Ann McIntyre made a will reading as follows, omitting the formal parts:

"*First.* I direct that all my just debts and my funeral expenses be paid.

"*Second.* I give, devise and bequeath all of the rest, residue and remainder of my estate both real and personal of which I shall die seised or possessed, or to which I shall be entitled at my decease, and wherever the same may be situated unto Emanuel J. Doyle of the city of Grand Rapids, Michigan, in trust, however, for the following purposes:   *   *   *

"(*c*) And to convert all of my property, both personal and real into money as soon as the same can be done without loss to my said estate or any part thereof.   *   *   *

"(*e*) And after my said estate has all been converted into money by my said trustee as above provided, that my said trustee shall divide all of the proceeds thereof, that is to say: All of the moneys derived from the sale or sales of my said estate equally share and share alike between St. John's Orphan Asylum of the city of Grand Rapids, Michigan, and the Little Sisters of the Poor of Grand Rapids, Michigan, that is, that each of the last-named institutions shall have one-half of the proceeds of my whole estate.

"(*f*) The above division and disposition of the proceeds of my estate is made out of a desire I have that all of my property should be given to charity after my death, I having no children or grandchildren living.

"*Third.* In compliance with and in obedience to a clause in the last will and testament of my late husband, John McIntyre, authorizing his executor and trustee, Emanuel J. Doyle, named in his said last will and testament, who is also my said executor and trustee, to dispose of his estate as I, his wife, should direct. I direct and desire under the power given me in said clause in said last will and testament of my said husband that the estate of my said husband, John McIntyre, be disposed of in exactly the same way as near as the same can be done as my own

estate shall be disposed of, under the foregoing provisions of this my last will and testament; that is to say: That after my death that all the estate of my said husband, John McIntyre, both personal and real, be converted into money by my said trustee as soon as the same can be done without sacrificing the whole or any part of said estate, or without any necessary loss thereto, or to any part thereof, and that during the time my said trustee is so converting the said estate of my said husband into money that he shall have power to make all necessary repairs thereon, pay taxes thereon, rent and collect rent for the whole or any part thereof, and sell and dispose of the whole or any part thereof when in his judgment he can obtain a reasonable price or value therefor, and that when the whole of the estate of my said husband is converted into money as aforesaid by my said executor that he divide all the proceeds or moneys received by him for said estate equally share and share alike between St. John's Orphan Asylum of the city of Grand Rapids, Michigan, and the Little Sisters of the Poor of Grand Rapids, Michigan, that is to say: That each of said last-named institutions shall receive one-half of all the proceeds derived from the estate of my said husband John McIntyre. * * *

"(*i*) And that my said executor and trustee shall be allowed out of said estate the sum of twenty-five hundred dollars per year in full payment and settlement for all his services of every nature and kind in reference to the management, sale and distribution both of my estate, and that of my said husband as above provided.

"*Fourth.* I hereby nominate and appoint Emanuel J. Doyle, of the city of Grand Rapids, Michigan, to be the executor and trustee of this my last will and testament."

Then follows the closing part of the will, which is in due form.

On October 12, 1909, Mrs. McIntyre made a codicil to her will in part as follows:

"Know all men by these presents: That whereas I the undersigned, Ann McIntyre, of the city of Grand

Rapids, Michigan, did on the ninth day of October, A. D. 1908, make, execute, publish and declare my last will and testament in writing, bearing date the day and year aforesaid.

"And whereas, I now desire to make certain changes therein and modifications thereof and additions thereto:

"Now, therefore, I, the said Ann McIntyre, being of sound mind and memory, do make, publish and declare this my codicil to my said last will and testament in manner following, that is to say:

"After the payment of my just debts and funeral expenses as provided in said will, I give and bequeath to my niece Jennie McIntyre, of Ann Arbor, Michigan, the sum of five thousand dollars.

"And to my nephew Don McIntyre, of Ann Arbor, Michigan, the sum of five thousand dollars. And to my nephew James Clancy, of Escanaba, Michigan, the sum of ten thousand dollars.

"And whereas, by my said last will the residue of my estate after being converted into money is directed by the trustee therein named to be divided between the St. John's Orphan Asylum of Grand Rapids, Michigan, and the Little Sisters of the Poor of Grand Rapids, Michigan; and whereas, the said St. John's Orphan Asylum is not an incorporated institution, but is under the management and control of religious associations and authorities, I direct that the trustee named in said will so dispose of, expend, lay out, or invest the moiety of such residue in said will directed to be for the benefit of the said St. John's Orphan Asylum in such manner as in his judgment shall be most beneficial for the inmates of the said St. John's Orphan Asylum, and to that end he is authorized and empowered to place the same in the hands and control of such persons or corporation as shall be in charge of said St. John's Orphan Asylum to be used only for the purposes aforesaid.

"And I further declare that by the term Little Sisters of the Poor mentioned in my said will is meant and intended the Home for the Aged, Little Sisters of the Poor, a corporation located at Grand Rapids, Michigan, and this direction and explanation shall apply to the disposition of the estate of my deceased husband,

John McIntyre as well as to the disposition of my own estate.

"And I do hereby ratify and confirm all and singular the provisions of my said last will and testament except as changed and modified by this my codicil thereto."

This codicil was executed in due form.

Mrs. McIntyre died December 26, 1910. Her will was offered for probate. Some of her nephews and nieces contested its probate on the ground of mental incompetency and undue influence. The case found its way to the circuit court, where it was tried before a jury. Upon the conclusion of the testimony the counsel for the proponent requested the court to direct a verdict in his favor on two grounds:

(1) That there was no evidence to submit to the jury in support of the contestant's claim.

(2) If there was such evidence, it only amounted to a scintilla, and it was the duty of the court to direct such verdict.

This request was denied. The court said that he would instruct the jury, as a matter of law, that the codicil, so far as it related to the legacies to James Clancy, Miss McIntyre, and her brother, and the provision in regard to the appointment of Judge Doyle as executor and trustee, and his compensation, were valid, and he would also instruct the jury that she had sufficient mental capacity to make this will and codicil, and leave to them only the question of undue influence, and the jury were instructed accordingly. The jury found that the will and codicil were not the last will and testament of Mrs. McIntyre, except that the provisions pertaining to the appointment and compensation of Judge Doyle and the legacies to Don McIntyre, Jennie McIntyre, and James Clancy were valid. The proponent moved for a new trial, which motion was overruled. It was renewed, and again overruled.

The contestants did not take any exceptions to the instructions of the court to the jury, nor did they take out any writ of error. The proponent brought the case here by writ of error.

It was conceded in this court by counsel in response to a question put to them by the court that the verdict of the jury must be affirmed as to the legacies to James Clancy, Jennie McIntyre, and Don McIntyre, and in regard to the appointment of Mr. Doyle as executor and trustee and his compensation.

The printed record contains more than 2,800 pages. The briefs are very voluminous. The case was argued orally at length. We may as well say at the outset that an examination of the record convinces us that the trial judge was right in saying Mrs. McIntyre was competent to make the will and codicil.

Before entering upon a discussion of the assignments of error, of which there are nearly 300, it will be helpful to take a general view of the situation as disclosed by the record.

Mrs. McIntyre's maiden name was Clancy, and the contestants, numbering 19, are nephews and nieces, the children of her deceased brothers, James, Dennis, and Edmund Clancy, who died before the will and codicil were executed. All of the widows of these brothers are dead. John Clancy, a brother of Mrs. McIntyre, was a bachelor who made his home with the McIntyres for years. He died in 1883, leaving a large estate. By his will he gave to Mrs. McIntyre and her husband jointly the homestead with all its contents on condition that neither of them should make any charge or claim against him or his estate for any services rendered or to be rendered. He also gave to the Roman Catholic bishop of the diocese of Grand Rapids the sum of $60,000 to purchase ground and to erect thereon an orphan asylum, the title to be in the bishop and his successors in office forever.

After making other bequests not material here, he gave the residue of his property to his three brothers, James, Edmund, and Dennis, and to his sister, Mrs. McIntyre, to be divided equally between them. Under the residuary clause of the will Mrs. McIntyre and her three brothers each received $50,000. Mr. and Mrs. McIntyre had only one child, a son, John D. McIntyre, who died at the age of 52. In May, 1906, Mrs. McIntyre broke her hip, and a few months later she broke it again, which left her a cripple for life. After she recovered from the second fracture she had to be helped up and down stairs, but could get around the house with crutches. She went down town in her wheel chair and sat on the veranda. In December, 1906, John McIntyre, the husband of Ann McIntyre, sent for Emanuel J. Doyle to come to his house to see him about some business. Judge Doyle is a lawyer, and has been police judge of the city. Later Judge Doyle, at the request of Mr. McIntyre, drafted a will for him which was executed January 2, 1907. By this will he gave his wife the use of all of his property for life, subject to a provision which devised all of his estate to Judge Doyle in trust to manage and care for the same and pay the necessary expenses, and from the income to pay to his son, John D. McIntyre, $15 a week during his natural life; the balance of his estate to be disposed of by his executor and trustee as his wife might will and direct. He appointed Judge Doyle executor and trustee with large powers. Mr. Doyle had from that time charge of Mr. McIntyre's entire business and gave checks for his expenses. John McIntyre died February 24, 1907.

After this will was made Judge Doyle went to the McIntyre house three or four times a week, staying from a few minutes to half an hour during John McIntyre's lifetime. Commencing in the summer after Mr. McIntyre's death Judge Doyle frequently took his

dinner at the McIntyre house on the invitation of John D., the son, or Mrs. McIntyre, and made much more frequent visits. After John D.'s death, which occurred September 17, 1908, Mrs. McIntyre insisted that he should come there regularly to his noonday meals, and as a rule he did so, and sometimes when requested he stayed there overnight.

Mrs. McIntyre's general health was good up to within a few days of her death, which occurred December 26, 1910, when she was upwards of 80 years of age. Mrs. McIntyre was a Roman Catholic, and had a pew in the cathedral for 25 years or more. Before she was hurt she went to church, how frequently is a matter of dispute, but she was undoubtedly an earnest Catholic. She was very friendly with her niece Jennie McIntyre. Except her nephew James Clancy and her niece Mrs. Griffin, Mrs. McIntyre was a comparative stranger to all her nephews and nieces on the Clancy side. James Clancy called on her occasionally as he was passing through Grand Rapids. He is not a contestant of the will. Mrs. Griffin married in January, 1892. She visited Mrs. McIntyre before her marriage, and Mr. and Mrs. McIntyre attended her wedding in Ann Arbor. After she was married she and her husband lived in a brick house belonging to the McIntyres adjoining their homestead. After a time the friendly relations between Mrs. McIntyre and Mrs. Griffin ended for causes which are claimed to be due to Mr. Griffin.

St. John's Orphan Asylum is a diocesan institution under the control of the bishop, which was founded by John Clancy's bequest of $60,000. When this case was tried, 139 children were housed in this building, and it was crowded. If the interior was finished, it would accommodate from 500 to 600 children. Destitute and orphan children between the ages of 4 and 14 years are taken into this home and are fed, clothed,

and educated.   The object of the home is to make good citizens of the children.

The record abounds with testimony that Mrs. McIntyre was proud of John Clancy for founding the home for orphans and of the good his money was doing long years after he was dead, and that she thought there was no greater charity than helping little children.   The record shows that in 1910, when the last addition to the orphans' home was being built, there was a lack of funds to complete it, and Mrs. McIntyre told Sister Paschal that it was too bad to have a building like that stand for the want of money when it was necessary for the children, and she said: "I will see what I can do, and perhaps I can help out."   She sent Judge Doyle to the home to look the building over and to ask the mother superior if they were in need of funds.   Judge Doyle informed her of the condition of affairs, and after a day or two she gave them a check for $2,500.   She was in the habit of sending a Christmas box to the home containing candy, oranges, and cake.

The Little Sisters of the Poor is another institution in the city of Grand Rapids managed by the Catholics. At the time of the trial it had 150 old people.   Mrs. McIntyre was also interested in this institution, and often spoke of the children and the old people.   Mr. McIntyre always sent them a present every Christmas, and she kept it up after his death.   Her husband favored the Little Sisters of the Poor, and she the orphan asylum.   Mrs. McIntyre said it was real charity to take care of little children and old people.

The record shows that in July, 1908, Mrs. McIntyre began to talk to Judge Doyle about making her will, and he made a rough draft of one which was completed August 7, 1908, which draft was submitted to former Circuit Judge Grove.   This will disposed of her property much the same as the will in controversy,

including the disposition of the estate left by her husband. This will made provision for the son, John D. McIntyre. Before it was executed he died. After his death, and during the two weeks before October 9, 1908, she talked to Judge Doyle about her will several times. He drafted another one in accordance with her instructions leaving out the provisions for the son. It was executed in Mrs. McIntyre's bedroom about 11 a. m. The subscribing witnesses were Dr. Barth, who had been her family physician for 27 years, and Alberta Van Wyck, who was a stenographer in Judge Doyle's office. Before Mrs. McIntyre signed it, Judge Doyle read the attestation clause, and then Mrs. McIntyre signed first, and requested Dr. Barth and Miss Van Wyck to sign as witnesses which they did. The persons present besides Mrs. McIntyre were Judge Doyle and the two witnesses. Mrs. McIntyre was sitting up at a little table in her usual chair. She selected these witnesses herself.

There is testimony that before her husband died they had agreed to give their property to the orphans and the Little Sisters of the Poor, because they thought there was no better charity than giving to these two institutions. There is testimony that Mrs. McIntyre said that her brother John Clancy must have had a great head on him, and she had been appreciating it more and more how he devised this plan of St. John's Orphan Asylum for devoting his money to charity. She said, "He must have had a great mind"; also, "he originated the St. John's Orphan Asylum, founded it, and left $60,000 to get it started." She said she wanted to supplement his efforts, that these little children were not able to work, and that they had no parents, or wayward and worthless parents, and somebody must support them, and she said she thought it was real charity to clothe, feed, and lodge these little children, and she wanted her money to go to

charity. She also said that these old men and women at the Little Sisters of the Poor were not able to work; that Mr. McIntyre always favored the Little Sisters of the Poor. They were his choice, and she knew he would want her to do as much for them as for St. John's Orphan Asylum, and she wanted the property divided equally between these two institutions.

There are many interesting questions presented by the assignments of error. There is, however, one pivotal question, the answer to which will decide whether it is necessary to discuss and decide the other questions. We have already determined that Mrs. McIntyre was competent to make the will and codicil. The other question is whether there was sufficient evidence of undue influence to take the case to the jury. The testimony of one of the domestics who was in the employ of the McIntyres for several years is said to sustain the charge of undue influence. In one side of the room occupied by Mrs. McIntyre was a door before which in her room was a cheval dressing case which concealed the door from an occupant of the room. The domestic, Mrs. Durand, opened this door slightly. She says she did this so that she could more readily hear the bell when Mrs. McIntyre rang for her. Her testimony is that when a priest or the sisters visited Mrs. McIntyre she repaired to the door and listened; her presence being unknown to Mrs. McIntyre and her visitors. Her testimony is:

"*Q.* At the time of Mr. John McIntyre's death were you about the house at the time of the funeral?

"*A.* Yes, sir.

"*Q.* Up to that time had you seen any priests or sisters about the house?

"*A.* No, sir; there wasn't none.  *  *  *

"*Q.* Now, when young John died, did they have any services at the house?

"*A.* Why, yes; when he died there was priests there, and after he was dead the Little Sisters and some of

the children from St. John's Orphan Home come up and prayed around the casket.

"*Q.* When did you first notice any of the priests or sisters coming about the house?

"*A.* Well, right after Mr. McIntyre died.

"*Q.* About how long after he died did they commence to come there?

"*A.* It might have been a month or so, little more.

"*Q.* How frequently did they come during the first six months after he died?

"*A.* Oh, not so—not so very often.

"*Q.* Give us your best recollection.

"*A.* Couple times a week.

"*Q.* Did you know Father Reid?

"*A.* Why, yes; I know him well.

"*Q.* Did you know Father Schmitt?

"*A.* Yes.

"*Q.* Did you see them about there?

"*A.* Yes.

"*Q.* And were they the ones that came?

"*A.* Yes, sir.

"*Q.* You say they commenced coming somewhere along a month after Mr. McIntyre's death?

"*A.* Yes, sir.    *    *    *

"*Q.* And did you see any of the sisters come?

"*A.* Yes, sir.

"*Q.* I want to get at the earliest time that you remember their coming, the sisters. How soon after Mr. McIntyre's death did they come?

"*A.* They didn't come so often; I don't just remember how many times they would come, or how soon.

"*Q.* You don't remember how soon they came?

"*A.* No; I don't.    *    *    *

"*Q.* Now, I want to call your attention this time to what you observed in relation to the priests coming there. I refer now to the time up to Mr. John McIntyre's death. Had you seen any there before that?

"*A.* John McIntyre?

"*Q.* Yes; the old gentleman before he died.

"*A.* No; I never seen any there.

"*Q.* Were there any there at the house that you saw during the period, the time of his death, while the body was there in the house, before the body was taken away from the house?

"*A.* Why, I think there were to see Mrs. McIntyre.

"*Q.* What is that?

"*A.* To see Mrs. McIntyre—Father Reid.

"*Q.* You think Father Reid did come?

"*A.* Yes.

"*Q.* To see Mrs. McIntyre?

"*A.* Yes.

"*Q.* After Mr. McIntyre's death what did you observe with reference to the priests coming there to the house? Just tell whether you saw them come, and how often.

"*A.* Why, yes; they used to come.

"*Q.* Who come?

"*A.* Father Reid and Father Schmitt; the sisters.

"*Q.* Did you notice anything with reference to whether they came oftener or not after Mr. McIntyre's death?

"*A.* Why they didn't come so very often about three or four times a week. * * *

"*Q.* Do you know how long that continued in that way?

"*A.* Why, until John's death.

"*Q.* Until John D.'s death?

"*A.* Yes; they used to come quite often; more than that after that.

"*Q.* After young John died how often did they come?

"*A.* Why, two or three times a day.

"*Q.* Three times a day?

"*A.* Yes. * * *

"*Q.* Following Mr. McIntyre's death, I wish you would tell this jury what you observed and heard in reference to the priests and their visits to Mrs. McIntyre's; I mean just following, in the earlier part, what you know of their coming there, and what they said to her with reference to her property. I refer now to Father Reid and Father Schmitt?

"*A.* Why, they used to tell her—Father Schmitt would tell her that she should leave her property to the church, and that she ought to do for it, and that Mr. McIntyre was in purgatory, and that she had to give them money to get him out of purgatory, to pray for him on Sunday at the cathedral.

"*Q.* Have you heard them tell her that?

"*A.* Yes, sir.

"*Q.* In the beginning they first commenced coming there and telling her that; what was her attitude towards them?

"*A.* She used to call Father Schmitt a 'little shrimp'; she says she guessed she knew what she wanted to do with her property; he didn't have to tell her.

"*Q.* And that was when they first commenced coming there?

"*A.* Yes.   *   *   *

"*Q.* Now did they keep on coming after?

"*A.* Yes; more all the time.

"*Q.* Whether or not the sisters continued to come more frequently?

"*A.* Yes; they were there, too,

"*Q.* And what have you seen and heard in connection with their talk with Mrs. McIntyre in her room?

"*A.* Well, I never heard what they said; I couldn't understand.

"*Q.* What had you seen them do?

"*A.* They would kneel down in front of her feet and kiss her hand and pray, but I could not understand what they said.

"*Q.* How frequently have you seen them do that?

"*A.* Oh, sometimes every day, or every other day.

"*Q.* Were they doing anything of the kind before Mr. McIntyre's death?

"*A.* No, sir.

"*Q.* Do you know anything about their bringing her any books, Catholic, or, that is, related to the Catholic religion, for her belief?

"*A.* Yes; they brought her books to read.

"*Q.* Who brought them?

"*A.* Well, Father Schmitt and Father Reid, and I don't know whether the sisters did. I never seen them bringing any.   *   *   *

"*Q.* Now, how frequently did you hear Father Schmitt tell her that her husband was in purgatory and they need this property to get him out?

"*A.* Oh, I don't remember how many times, but—

"*Q.* Well, did you more than once?

"*A.* Yes, sir.

"*Q.* Whether that continued on through the time that you were there?

"*A.* Well, they used to talk about her property every time they would come.

"*Q.* State whether or not that was the topic of conversation largely while they would be there?

"*A.* Yes, sir; they used to talk about it all the time.

"*Q.* In the beginning following the death of her husband state whether or not at that time she fell in with the idea, or gave them anything as far as you knew.

"*A.* She used to give them money.

"*Q.* I mean in the beginning, right after Mr. McIntyre died?

"*A.* No; she didn't use to give them any money then that I know of; I don't remember of it.

"*Q.* State whether or not that was the time when she used to call Father Schmitt a 'little shrimp.'

"*A.* Yes, sir.

"*Q.* What did she say—I want to get that clearly out—as to just what she said that indicated her reason for calling him that?

"*A.* Well, he used to be so persistent that he wanted to make her give the property to the church, and she guessed she would know what she wanted to do with the property, and she didn't like him.

"*Q.* About how long after her husband's death occurred did she commence giving them money, if she did, as you have suggested?

"*Mr. Kleinhans:* Who is 'them'?

"*Mr. Lombard:* I mean the priests.

"*Mr. Kleinhans:* Which one?

"*Mr. Lombard:* Well, either one.

"*A.* Well, Father Reid used to give the communion.

"*Q.* At the house?

"*A.* Yes, sir. And I used to get her bag, and she used to give him $20 gold pieces.

"*Q.* How frequently did that happen?

"*A.* Well, I don't just remember, but quite often.

"*Q.* You knew Father Reid also?

"*A.* Yes, sir.

"*Q.* Did you hear any conversation between him and her with reference to the property there where she lived?

"*A.* Yes, sir; he wanted the corner for a cathedral.

"*Q.* What did you hear her say to him about that? Just tell what he said to her what he wanted.

"*A.* What Father Reid wanted?

"*Q.* Yes; what did you hear Father Reid say to Mrs. McIntyre?

"*A.* That she ought to do for the church and to give a corner for a cathedral, for Father Reid's cathedral.

"*Q.* That is the corner where she lived at that time?

"*A.* Yes; the corner where she lived.

"*Q.* Just explain to the jury how you came to hear their conversations?

"*A.* Well, they used to come up there so much, and I heard—thought that they were talking to her, you know, and I used to go up the back way and listen to that door, up the back stairway. * * *

"*Q.* How many times did you hear them, either Father Reid or Father Schmitt, speak of her husband being in purgatory?

"*A.* Well, I don't remember how many times, but they used to tell her quite often that they hadn't said a prayer for him on this Sunday because she would have to give them more money to say another prayer that next Sunday for him in church, you know, to get him further out of purgatory.

"*Q.* State whether or not that condition continued up to the time you left there; whether they still were doing that when you left there.

"*A.* They didn't—I didn't hear them say anything about it after her will was made.

"*Q.* Not after the will was made?

"*A.* No, sir.

"*Q.* What did you observe about the frequency of their coming there after the will was made; did they come as often as they did before?

"*A.* No, sir; they did not. * * *

"*Q.* After these books had been brought there and the priests and the sisters had been going there for some months, did you ever hear her say anything more, or call Father Schmitt a 'shrimp,' or anything further?

"*A.* No, sir; she never used to say anything about that.

"*Q.* She changed her attitude in the matter?

"*A.* Yes, sir. * * *

"*Q.* She received the injury about four weeks before you were married?

"*A.* Yes, sir.

"*Q.* And state whether or not she was then confined to the bed at the time of your marriage?

"*A.* Yes, sir. Yes; she was.

"*Q.* And from that time on was she ever able to help herself or get about?

"*A.* No, sir; she always had to be helped; she couldn't get in or out of bed.

"*Q.* And from that time on did you ever know of her going to church?

"*A.* No, sir; she never went to church.

"*Q.* Did you know of the priests or sisters visiting her at the time she was injured; did you ever see them around there?

"*A.* Why, I don't remember, but I think they came once or twice.

"*Q.* You think they came once or twice?

"*A.* Yes."

On the cross-examination she testified in part:

"*Q.* Now, while Mrs. McIntyre was in bed with this broken hip did either of her pastors or any pastors of the Catholic Church come there to see her?

"*A.* Yes; I think Father Reid was there.

"*Q.* Father Reid?

"*A.* Yes.  *  *  *

"*Q.* What was Father Reid asking her to give him at that time?

"*A.* Didn't ask for anything.

"*Q.* Was she giving him $20 gold pieces or $10, or what?

"*A.* Well, I don't remember of her giving anything. *  *  *

"*Q.* Now, you have told us that you saw Father Reid there in 1906 at the time she had this broken hip. Did Father Reid or Father Schmitt call there occasionally from that time on until the death of John McIntyre her husband?

"*A.* Why, I don't remember of their only being there once.

"*Q.* Who?

"*A.* Father Reid.

"*Q.* That was when she was upstairs with a broken hip wasn't it?

193 Mich.—18.

"*A*. Yes, sir; that is all I seen him.

"*Q*. Didn't you ever see Father Schmitt there after that time and before John McIntyre died?

"*A*. Before?

"*Q*. Yes.

"*A*. I don't remember whether he was or not. * * *

"*Q*. After John McIntyre's death how long after his death was it before you used to see these priests coming there all the time?

"*A*. Oh, they came right away. * * *

"*Q*. Do you tell the jury that right after John McIntyre was buried that you used to see Father Schmitt or Father Reid going there nearly every day, did you?

"*A*. Well, I don't know. * * *

"*Q*. From the time John McIntyre died in February, 1907, the priests and sisters used to come pretty frequently from that time up to the time John D. died, didn't they?

"*A*. Yes.

"*Q*. And were there more than two priests that used to go there, Father Schmitt and Father Reid?

"*A*. That is all I saw.

"*Q*. Who came there oftener, Reid or Father Schmitt?

"*A*. Father Reid.

"*Q*. Who would stay longer, Father Schmitt or Father Reid?

"*A*. Well, I don't know who would stay the longest. * * *

"*Q*. When you went back to work you began listening right away, didn't you?

"*A*. Well, I don't know whether I did right away.

"*Q*. Where were Father Reid and Mrs. McIntyre talking the first time you began listening?

"*A*. Why, in her room. * * *

"*Q*. What time of day was it that you went up there to listen?

"*A*. Well, both times, all day, whenever they would be there.

"*Q*. All day; I see.

"*A*. Not all day, but I mean whenever they would be there, the morning or the afternoon.

"*Q*. Up to the time that you began to listen up this

back stairway there had you ever overheard any conversation between Father Reid and Mrs. McIntyre?

"*A.* Before I commenced to listen?

"*Q.* Yes.

"*A.* No; I don't remember.    *  .  *    *

"*Q.* What did Mrs. McIntyre say that day?

"*A.* She never said very much.

"*Q.* What did Father Reid say upon that occasion?

"*A.* Well, he kept telling her that he wanted the house the corner for a cathedral, and she ought to give it to the church to do for her.    That is before John D. died.

"*Q.* Is that just what he said?    Have you told us just what Father Reid said?

"*A.* Well, I couldn't word it word for word the way he said it, but that was what I understood.

"*Q.* And what did she say in reply?

"*A.* She never used to say very much about that at first.

"*Q.* You say Father Reid wanted her to give that place, that corner for a cathedral, for his church, or for his cathedral?

"*A.* Yes.

"*Q.* For his cathedral.    Just what was the language; what was it Father Reid said now; how was it he said it?

"*A.* Well, I don't remember how he worded it.

"*Q.* You tell it as you think he said it?

"*A.* Well, that he wanted—*    *    *

"*Q.* Give it as near as you can.

"*A.* Well, I don't know how to express myself.

"*Q.* Express it just as Father Reid did.

"*A.* Well, that he wanted the corner for a cathedral and how nice it would be if he had a cathedral on the corner, and that she ought to give him the corner for a cathedral or a church.

"*Q.* Cathedral or a church.    What else did he say?

"*A.* Well, I don't remember.    *    *    *

"*Q.* Tell what Father Reid said just as near as you remember it?

"*A.* Why, I don't know what he exactly said.

"*Q.* Well, we don't.    Tell us just as near as you remember what Father Reid said from that time on.

"*A.* Well, he talked about her property there.

"*Q.* What did he say? Just tell us what he said.

"*Mr. Lombard:* She is trying to, the best she can.

"*A.* Well, I don't know just what he did say. * * *

"*Q.* Have you now told the jury all that you can remember that you heard said there between Father Reid and Mrs. McIntyre on that first occasion of your eavesdropping?

"*A.* Why, I don't know whether I did or not.

"*Q.* Can you think of anything more that you heard that time?

"*A.* I can't just now. * * *

"*Q.* Do you now say that you heard Father Schmitt use that language to Mrs. McIntyre before John D. McIntyre died?

"*A.* Yes.

"*Q.* Then, as I understand you, Mrs. Durand, Father Reid wanted Mrs. McIntyre to give the homestead there for cathedral purposes, and Father Schmitt wanted her to give money for masses; was that what they were asking for?

"*A.* Yes; and to give the property to the church, and—

"*Q.* Who was it said she ought to give the property to the church?

"*A.* Oh, they both talked about it. Father Schmitt said that she should give money to get Mr. McIntyre through purgatory, and to pray for him on Sunday in church, and to get him out that much farther, and that she ought to do for the church now while she was alive, and that she couldn't do it afterwards, and that she had a lot of money and she ought to do it. That is Father Schmitt. * * *

"*Q.* What you just told us, was that what Father Schmitt said the first time?

"*A.* I don't know whether it was the first time or the last time.

"*Q.* You can't tell what you did hear him say the first time, can you, and be sure about it? What did Mrs. McIntyre say when Father Schmitt said that?

"*A.* I never could just exactly hear what she would say; she would talk so low. * * *

"*Q.* And who did Father Reid say she ought to give the money to for masses? Did Father say she ought to give money for masses or to get him out of purga-

tory, which was it Father Reid said, what language was it he used?

"*A.* I don't know who got the money.

"*Q.* What did he say? Did he say, 'You ought to give money for masses,' or did he say, 'You ought to give it to get your husband out of purgatory'?

"*A.* He said that, too.

"*Q.* Which was it he said? Just tell us what Father Reid said about that.

"*A.* To get him out of purgatory, and she ought to do for the church, and that he wanted the corner for a cathedral.   *   *   *

"*Q.* I know, but what was it he said besides what you have said?

"*A.* Why, I don't know.

"*Q.* Now, you can't think of anything else Father Reid said, can you? Well, if you can't, what did you hear Father Schmitt say? You have told us before recess that Father Schmitt said she ought to give money for masses, or to give money while she was alive; she couldn't do it after she was dead. Now, what else, if anything, did Father Schmitt say?

"*A.* And that she had means, and that she ought to do for the church.

"*Q.* What else did Father Schmitt say?

"*A.* That she ought to leave it to the church and do for the church and for the sisters to help them.

"*Q.* What else did Father Schmitt say?

"*A.* Why, I don't remember exactly now.

"*Q.* You can't think of another thing. Now, what did you use to hear the sisters say when you were listening at the door? I don't know, but you have told us you could not hear what they said.

"*A.* No, sir."

Both of the priests referred to by this witness were sworn and denied in the most emphatic language that they made the statements to which Mrs. Durand testified, and that they had no knowledge of the making of the will. Father Schmitt says he made but two requests for funds of Mrs. McIntyre, and one was that she contribute toward the purchase of a chime of bells, and that she did so, and that he made a re-

quest for a contribution to procure a stained glass window which she said she would consider, and that she never complied with his request.

Father Reid testified in detail in relation to his visits, which began when Mr. McIntyre was alive, and at a time when Father Reid was building a little church just outside of the city limits. Soon after this visit Mr. McIntyre sent him a check for $50. He also testified that during the three or four years he visited the McIntyres gold coins were given to him by Mrs. McIntyre amounting approximately to $220. Some of the sisters were sworn as witnesses. They as well as the priests said their visits were made only when they were sent for or when they were invited to come, and that they never sought to influence Mrs. McIntyre in the disposition of her property.

We have quoted all of the testimony of Mrs. Durand bearing upon the question of undue influence. If we eliminate a consideration of its doubtful source and give to it the fullest probative force, does it constitute undue influence within the meaning of the law? It is to be observed that Mrs. Durand in her testimony did not give the replies made by Mrs. McIntyre to the various suggestions made to her by the priests. She says she could not hear them.

It is also to be noted that, if Father Reid ever requested that the corner lot be given him for a cathedral, his request was not heeded, and that, if Father Schmitt ever solicited property to pay for masses and the giving of prayers to get souls out of purgatory, these suggestions were not acted upon by provisions in the will for any such purpose.

It is a significant thing that in all the voluminous testimony of Mrs. Durand she does not suggest that the St. John's Orphan Asylum or the Little Sisters of the Poor were ever mentioned in her hearing by either of the priests or Mrs. McIntyre.

There is no testimony indicating that Mrs. McIntyre, at any time after the death of Mr. McIntyre, intended to make any other provision for her living relatives than those she did make.

The question of undue influence is not a new one in this court. In *Maynard* v. *Vinton*, 59 Mich. 139 (26 N. W. 401, 60 Am. Rep. 276), Mr. Justice CHAMPLIN, speaking for the court, said:

"To constitute undue influence, some act or acts must have been done to cause the testatrix to dispose of her property contrary to her desire. If it was given according to her free and intelligent desire at the time of making and executing the will, although this desire was prompted by her mother or Miles [who were beneficiaries under the will], it would be a valid disposition of her property. The influence, to vitiate the will, must have been such as to amount to force and coercion, destroying her free agency, and there must be proof that the will was obtained by this coercion. * * * Neither can it be set aside on the ground of undue influence, unless such influence amounted to a degree of constraint, such as the testatrix was too weak to resist, and such as deprived her of her free agency, and prevented her from doing as she pleased with her property. Neither advice nor arguments nor persuasion will vitiate a will made freely from conviction, though such will might not have been made but for such advice or persuasion."

The language of Chief Justice BROOKE, in *Re Williams' Estate*, 185 Mich. 97 (151 N. W. 731), is pertinent here:

"We do not lose sight of the fact that undue influence need not be proven by direct evidence, but can be established by indirect and circumstantial evidence. This principle has been laid down in many Michigan cases, the last two of which are *In re Loree's Estate*, 158 Mich. 372 (122 N. W. 623), and *In re Du Bois' Estate*, 164 Mich. 8 (128 N. W. 1092). But we are of opinion that the contestant must introduce evidence from which inferences may fairly be drawn that such influence was exercised. * * *

" 'To vitiate a will there must be more than influence. It must be undue influence. To be classed as "undue," influence must place the testator in the attitude of saying, "It is not my will, but I must do it." He must act under such coercion, compulsion, or constraint that his own free agency is destroyed. The will or the provision assailed does not truly proceed from him. He becomes the tutored instrument of a dominating mind, which dictates to him what he shall do, compels him to adopt its will instead of exercising his own, and, by overcoming his power of resistance, impels him to do what he would not have done had he been free from its control. * * * Influences to induce testamentary disposition may be specific and direct without becoming undue. It is not improper to advise, to persuade, to solicit, to importune, to entreat, and to implore. Hopes and fears and even prejudices may be moved. Appeals may be made to vanity and to pride; to the sense of justice and to the obligations of duty; to ties of friendship, of affection, and of kindred; to the sentiment of gratitude; to pity for distress and destitution. It is not enough that the testator's convictions be brought into harmony with that of another by such means. His views may be radically changed, but so long as he is not overborne and rendered incapable of acting finally upon his own motives, so long as he remains a free agent, his choice of a course is his own choice, and the will is his will, and not that of another.' [*Ginter* v. *Ginter*, 79 Kan. 721 (101 Pac. 634, 22 L. R. A. [N. S.] 1024)]."

See, also, *Severance* v. *Severance*, 90 Mich. 417 (52 N. W. 292) ; *Lamb* v. *Lippincott*, 115 Mich. 611 (73 N. W. 887) ; *In re Shanahan's Estate*, 176 Mich. 137 (142 N. W. 573) ; *In re Foerster's Estate*, 177 Mich. 574 (143 N. W. 616).

The case before us is that of a Catholic lady in the possession of her mental powers, without a living father or mother, brother or sister, child or grandchild. She is in the possession of a comparatively large fortune, the major portion of which came to her and her husband by reason of the will of her bachelor brother, who had made his home with her and her husband for years, and the will of her husband. The will of her brother, through which she got much of this prop-

erty, set apart $60,000 to establish a worthy charity which was a going concern with many needs during the later years of the lives of Mr. and Mrs. McIntyre. There can be no possible doubt from this record that Mr. and Mrs. McIntyre were both solicitous about these two charities. It was a most natural and reasonable act for Mrs. McIntyre to make provision for them. If we give the fullest credence to the testimony of Mrs. Durand and to all fair inferences to be drawn therefrom, it is not made to appear that any influence by priest or other person caused Mrs. McIntyre to make disposition of her property otherwise than according to her judgment and desire. If we apply the principles of law so often announced by this court relative to undue influence to the instant case, it should have been said as a matter of law that there was not sufficient evidence of undue influence to take the case to the jury. As it is not likely a different case can be made, this conclusion makes it unnecessary to consider the other assignments of error.

The judgment is affirmed as to the niece and nephews and the executor. It is reversed as to the other two bequests, and a new trial is ordered, with costs to appellant.

STONE, C. J., and OSTRANDER, STEERE, BROOKE, and PERSON, JJ., concurred with MOORE, J. KUHN and BIRD, JJ., concurred in result reached.