*In re* HANNAN'S ESTATE.
KEMP *v.* HANNAN.

1. WILLS—FRAUD—COERCION—UNDUE INFLUENCE—BURDEN OF PROOF.
   In contesting a will on the ground of fraud, coercion or undue
   influence on the part of proponent, the contestant has the
   burden of establishing that the testator was induced to execute
   the will by fraud, coercion, or undue influence of the proponent.

2. SAME—FRAUD—UNDUE INFLUENCE—COERCION—EVIDENCE.
   In contest of will whereby 73-year-old testatrix left $2,000 to one
   son with whom she had had unfriendly relations for a number
   of years, $30,000 with which to purchase an annuity for other
   son in whose ability to handle money she appeared to have
   little confidence and residue to daughter who had lived with
   testatrix during most of latter's widowhood, evidence *held,* to
   establish that the will represented her own well-considered
   judgment and decision as to distribution textatrix desired
   and not to have resulted from fraud, undue influence, or coer-
   cion on the part of daughter.

3. SAME—UNDUE INFLUENCE—OPPORTUNITY.
   Opportunity alone cannot give rise to a valid inference that un-
   due influence has been exercised upon a testatrix in the making
   of her will even though the opportunity may have covered a
   period of a number of years.

4. SAME—COERCION—UNDUE INFLUENCE—LOSS OF DISCRETION BY
   TESTATOR.
   To establish coercion and undue influence upon the testator in
   the making of a will the contestants must prove that the will
   of the testator was dominated and overcome, that his free
   agency was destroyed, that he was rendered incapable of act-
   ing upon his own motives and that he was prevented from
   exercising his own free judgment and discretion in the disposi-
   tion of his property.

5. SAME—TESTAMENTARY CAPACITY—EVIDENCE—DISPOSITION OTHER THAN IN ACCORDANCE WITH STATUTES OF DESCENT AND DISTRIBUTION.

> The fact that testator disposes of his property in some other way than under the statutes of descent and distribution, instead of indicating a lack of testamentary capacity, indicates the testator knew he had a right to dispose of his property, and availed himself of the right of disposing of his property as he saw fit.

6. SAME—UNDUE INFLUENCE—FREE AGENCY.

> Undue influence, to vitiate a will, must have been such as to amount to force and coercion, destroying the free agency of the testator, and there must be proof that the will was obtained by this coercion.

7. SAME—PRESUMPTIONS—EVIDENCE.

> Undue influence cannot be presumed, but must be proved and in connection with the will and not with other things.

8. SAME—ADVICE—ARGUMENTS—PERSUASION.

> Neither advice, nor arguments, nor persuasion will vitiate a will made freely from conviction, though such will might not have been made but for such advice or persuasion.

9. SAME—UNDUE INFLUENCE A SPECIES OF FRAUD.

> Undue influence is a species of fraud and, like fraud, must remain undefined by the courts.

10. SAME—UNDUE INFLUENCE—OPPORTUNITY—STATUTES OF DESCENT AND DISTRIBUTION.

> Undue influence cannot be predicated upon opportunity alone, nor upon a disposition of property not in accord with the statutes of descent.

11. SAME—RELATIVES AS OBJECTS OF BOUNTY.

> The general rule is that every person of full age and sound mind is at liberty, in making a will, to select the objects of his bounty among his relatives at discretion, or pass them all by, if he is so disposed.

12. SAME—PROVINCE OF COURT OR JURY IN WILL CONTEST—WISDOM OF DISTRIBUTION.

> It is not the province of the court or jury to substitute their judgment for that of the testator, or to correct a seeming injustice, for so long as the testator was of sound mind and expressed his own desires in the instrument, he was at liberty to make whatever disposition he chose.

13. Same—Fraud—Evidence.

In contest of will wherein contestants sought to prevent probate of will on ground of proponent's fraud, it was incumbent upon contestants to show that proponent had misrepresented material facts and that testatrix had relied upon and was influenced by such misrepresentations in disposing of her property.

14. Same—Disposition to Children of Testatrix.

Will whereby one son was given $2,000 and $30,000 was set aside to purchase an annuity for other son and residue given to daughter *held*, not unreasonable or unnatural in view of evidence showing mother's relations with her three children.

Appeal from Wayne; Marschner (Adolph F.), J. Submitted April 2, 1946. (Docket No. 6, Calendar No. 42,892.) Decided June 3, 1946.

In the matter of the estate of Amanda Hannan, deceased. Marjorie Hannan Kemp presented the will of Amanda Hannan for probate. William W. Hannan and F. Fredrick Hannan objected thereto. Contest certified to circuit court. Verdict and judgment for contestants. Proponent appeals. Reversed and remanded for entry of judgment for proponent sustaining will and remanding to probate court with direction to admit will to probate.

*Thomas B. Moore* and *Milman Andrews,* for proponent.

*Robert J. Hanley* and *A. W. Sempliner,* for contestant F. Fredrick Hannan.

*Ernest Wunsch,* for contestant William W. Hannan.

*LeRoy J. Abt,* of counsel, for contestants.

Starr, J. This is a will contest. Amanda Hannan, a widow, died in Detroit October 29, 1941, leaving

a last will and testament executed on September 29th of that year. After providing for payment of funeral, burial, and administration expenses and inheritance taxes, the will stated in part:

"Second: After much deliberation, I give and bequeath to my son, William W. Hannan, the sum of $2,000. *The omission on my part to further provide for my said son is intentional.*

"Third: I direct my executrix, hereinafter named, to purchase an annuity for my son, F. Fredrick Hannan, and to expend therefor the sum of $30,000. I direct that such annuity be of the so-called 'refund annuity type' and that, if possible, payments thereunder shall commence when he shall attain the age of forty years and shall continue for his life. * * * I also direct, that, if possible, the proceeds and corpus of said annuity shall IN NO WAY be subject to anticipation or assignment on the part of my said son, nor shall the corpus thereof be available to him or to any of his creditors. * * *

*"I make this provision for my said son so that he will always be assured of a sum certain come what may.* * * *

"Fourth: I give, devise and bequeath all the rest, residue and remainder of my estate, of which I may die seized or possessed, or to which I may be entitled at the time of my death, of whatsoever nature, real, personal or mixed, and wherever situated, to my daughter, Marjorie M. Hannan, for her own use and benefit forever.

"Fifth: If any person shall object to or contest the probate of this will, or any part thereof, or attempt to set aside the probate of said will, or any part thereof, or attempt to have the said will, or any part thereof, adjudged to be invalid or inefficient, or attempt to modify any provisions of said will, or file a claim against my estate, any devise or bequest or annuity given to such person shall be thereby revoked and annulled, and become and be

of no effect, and such person shall receive no part of or benefit from my estate and property, and in such case, I hereby revoke, cancel, and annul every such devise, bequest or annuity hereby given to such person.''

The daughter, Marjorie Hannan (Kemp), who was named executrix, presented the will for probate in Wayne county. The sons, William and Fredrick, filed objections to its admission on the ground that their mother had been induced to make and execute the will by the fraud, coercion, and undue influence of their sister Marjorie. On petition of contestants the matter was certified to the circuit court and a jury was demanded. At the close of contestants' proofs, and again at the close of all proofs, the proponent moved for a directed verdict in her favor. The trial court reserved decision on both motions and submitted the case to the jury, which returned a verdict against the will. Proponent's motion for judgment *non obstante veredicto* was denied, and judgment was entered disallowing the will. Proponent's motion for a new trial was denied, and she appeals.

When the mother, Amanda Hannan, executed the will in question, she was about 73 years of age. At that time Marjorie was 45 years old, William 41, and Fredrick 33. In the paragraph of the will giving William $2,000, the mother expressly stated: ''The omission on my part to further provide for my said son is intentional.'' In the paragraph providing for an annuity for Fredrick she stated: ''I make this provision for my said son so that he will always be assured of a sum certain come what may.'' She gave the residue and remainder of her estate to her daughter Marjorie. The burden was on the contestant sons to establish their claim that the mother

was induced to make and execute the will by the fraud, coercion, or undue influence of their sister Marjorie. *In re Livingston's Estate,* 295 Mich. 637; *In re Reed's Estate,* 273 Mich. 334; *In re Shepard's Estate,* 161 Mich. 441; *In re Loree's Estate,* 158 Mich. 372.

The record establishes that the mother was an energetic, capable, and strong-willed woman; that she had assisted her husband in making investments; and that after his death she capably managed her own property and business affairs. A doctor, who knew the family well, testified that she "was always a well-composed woman  *  *  *  a good wife and housekeeper  *  *  *  a strong-willed woman." A friend of the family, who was engaged in the real-estate business, stated: "The mother, Amanda Hannan, was strong-willed, a very distinguished and intelligent woman." Another friend who had known the family for about 20 years testified: "I would say Mrs. Hannan was a woman who made up her own mind and held to her resolves." William Hannan testified: "My mother was of the  *  *  * old-school type, with very strict moral ideas." It should be noted that no question is raised on this appeal regarding the mother's testamentary capacity.

The daughter Marjorie had resided with her parents prior to her father's death, and thereafter she continued to live with her mother until her death. She devoted many years of her life to assisting and caring for her mother, was her almost constant companion, and did not marry until shortly before her mother's death. A friendly and affectionate relationship existed between them. Mr. Erwin Springman, assistant trust officer of the Detroit Trust Company, who had known the mother for

about 15 years and who witnessed her will, testified in part:

"She (mother) made the remark that * * * she felt that Marjorie had given up her whole life for her; she * * * said that Marjorie had been a marvelous daughter and really her only purpose in living. * * *

"Mrs. Hannan said that she wanted her estate primarily to go to her daughter in return for her faithful services to her."

The nurse who attended the mother in the hospital during her last illness testified:

"Mrs. Hannan said she had been a widow for 15 years and that Marjorie had afforded her much happiness and included her in all her trips * * * and very seldom left her alone. * * *

"At the time Mrs. Hannan expired in the hospital Mr. and Mrs. Kemp and myself were present. * * * Neither William nor Fred was at the hospital or in the hospital room that afternoon or * * * evening of the day she expired. They just wished to be called when she expired."

A business man who knew the mother testified: "Mrs. Hannan always told us that Marjorie was a very dutiful daughter. * * * She spoke very highly of her on all occasions. She told us that she had taken up all Marjorie's life." A friend who had known the mother for 27 years said: "The mother told me Marjorie * * * sacrificed her life to take care of her." Another acquaintance of the mother testified:

"In my acquaintance with Mrs. Hannan and her daughter Marjorie, Mrs. Hannan told me she regretted that Marjorie had not married because she felt that it was her devotion to her which had prevented her, possibly, from so doing. She said that

Marjorie was very devoted to her; that on every occasion that she needed anything done for her or wished to be taken any place, that Marjorie always sacrificed her own pleasure or anything that she might want to do to take care of the mother's wants.''

In support of his objections to the admission of the will, the son William testified in considerable detail regarding the childhood quarrels between him and his sister Marjorie and regarding her criticism of himself, his wife, and his friends. It appears William had been a rather ungovernable youngster and had caused his parents trouble and worry. After he was grown, he continued to quarrel with his parents and sister, and there was testimony that he struck and fought with his father, slapped his sister, and on two or more occasions struck his mother. When he was about 19, trouble arose between him and his parents over his association with a certain girl. As a result of this trouble he left college at the end of his first year and shortly thereafter left the home of his parents and married the girl. For many years he remained away from his parents' home and showed little or no interest in them. Frank Hannan, the husband of testatrix and the father of Marjorie, William, and Fredrick, died in 1927. Prior to his death he had suffered a mental breakdown, and petitions had been filed for his commitment as an insane person and for the appointment of a guardian of his estate. William opposed his mother in connection with her efforts to have a guardian appointed for the father, and after his father's death he strenuously opposed his mother in connection with the administration and distribution of the estate. In the course of the litigation with his mother over the father's estate, a settlement was made whereby the sons William and Fredrick and

the daughter Marjorie each received about $88,000 in money and securities. This trouble over the father's estate appears to have accentuated the strained relationship between William and his mother. In 1934 William wrote his mother, stating in part:

"I am sorry that you didn't care to see me when I called at the house this morning. * * * After all of the trouble and bitterness of 10 years ago, with the family split asunder and dad passing on, you perhaps do not choose to forgive or forget. However, it was not the purpose of my call to plead forgiveness nor to ask you to forget if you did not care to. * * *

"To put others at rest who may seek to counsel you, I want nothing which belongs to you now or in the future. It might be natural enough for others to say that perhaps I have squandered my estate and that I now, after these years, seek your favor for a purpose. Nothing is further from the truth. I desire nothing."

The strained relationship between William and his mother and sister apparently continued until the mother's death. The record clearly establishes that the mother felt a strong resentment toward him because of his physical abuse of her, the trouble and worry he had caused her, and the fact that he had opposed her in litigation over the father's estate.

It appears that Fredrick Hannan had likewise been somewhat ungovernable and had caused his parents and sister trouble and worry. While in college he was arrested for having liquor in his car; he was dismissed from college; he drank considerably; he lost a substantial part of the $88,000 which he had received from his father's estate; and he kept his mother and sister in a continual quandary

and state of worry over whether or not he was legally married to the woman with whom he lived. There was testimony that he used profane and obscene language in the presence of his mother and sister; that when angry he slapped his sister and threw dishes at her; and that he smashed articles of property in the mother's home. On numerous occasions he remained away from home for several days, which caused his mother and sister considerable concern. There was testimony that during his mother's last illness in the hospital, Fredrick came to see her while under the influence of liquor. The record clearly establishes that the mother had no faith in Fredrick's ability to handle money and conduct himself properly, and that she provided for the establishment of an annuity for him for the reason, as stated in her will, "so that he will always be assured of a sum certain come what may." The record also establishes that the mother felt a strong resentment toward William and that she did not intend to leave him any substantial part of her estate.

As hereinbefore mentioned, the burden was on the contestant sons to establish the alleged fraud, coercion, or undue influence on the part of their sister Marjorie. Therefore, it becomes necessary to consider the testimony adduced by them in support of their claim. William testified in part:

"During the time I was at the high school I brought some of my friends home with me.   *   *   * Sister would tell mother so that everyone could hear, 'I wish he would get those bums out of the house,' or words to that effect.

"I first met Florence Dalby in 1919.   *   *   * When we returned home, she (Marjorie) told mother, 'I have met the girl that Bill has been going to see and she is plain no-good; she is a flirt and a hussy.'   *   *   *

"My mother repeatedly told me that Marjorie had told her what type of a girl this was and she didn't want her in the house.   *   *   *   Subsequently, I married Florence Dalby on May 11, 1925.

"In 1920   *   *   *   I might say I was thrown out of home. I had my choice of giving up my association with the girl I later married or leaving home. I chose the latter course.   *   *   *.

"There was not a day that passed that my sister didn't criticize and find fault with me to my mother while I was finishing my high school course.   *   *   *

"In the fall of 1922 I went east to school.   *   *   * My sister said to both my mother and father, 'Why send him away to school? He is wasting his time on that hussy and that streetwalker.'   *   *   *

"My sister's conduct was   *   *   *   constant bickering, stirring up arguments, throwing the contents of my bureau drawers in the middle of the bedroom floor, taking my clothes down off the clothes press, throwing them on the floor, which made me angry.   *   *.   *

"After my father's death I attempted to get in touch with my mother. Some years had elapsed but I wanted to see her.   *   *   *   I called my mother on the telephone.   *   *   *   The phone always was answered by my sister who, when she recognized my voice,   *   *   *   would hang up.   *   *   *

"On September 21, 1941, in the evening, I received a telephone call from my sister, stating that my mother was in Henry Ford hospital. I promptly hung up on her, because after our last meeting I never wanted to see her again.   *   *   *

"I had lost my $80,000   *   *   *   inheritance from my father's estate through unfortunate investments.   *   *   *

"I have told my sister on various occasions when she accused my wife of being a streetwalker, I would slap her face. In fact, I have slapped it.   *   *   *

"At that time (after father's death) my mother asked for a widow's allowance and I opposed her in that. * * *

"I was opposing my sister in truth and fact, not my mother, all the way through."

The contestant son Fredrick testified in part as follows:

"I did not entertain my friends in the house very often. *. * * The reason I didn't was that my school associates were not very well liked at home. My sister objected to them. * * *

"There wasn't one friend that I had at the university or * * * in the city, that wasn't complained about in one way or another by my sister to my mother. * * *

"From the time my brother left home until my mother's death Marjorie would say to my mother that she (William's wife) was no good; she was a hussy; streetwalker. * * *

"My sister complained to my mother all the time about young ladies with whom I associated in school or subsequent to my schooling. * * * I recall one party that I took my sister to at the Book Cadillac hotel about 1934. * * * Her remarks principally were directed about my friends whom I had invited to attend the party. She said they were a bunch of drunks. * * *

"My sister told my mother that I was insane. This insanity remarks relative to the insanity of the Hannan family * * * was quite a subject of conversation in the family for a number of years. * * * There was some discussion over the way she thought I should run my business. She didn't think it was being run properly. * * *

"As to William showing ill temper around the house, there were family arguments and things of that sort around the. home. I recall times when my brother would fly into a rage as the result of them. * * *

"I heard mother express her disapproval of William's opposition to her claims to the contents of the boxes in the Union Guardian Trust Company and the Detroit Trust Company in my father's estate. She didn't like William's treatment of her. * * *

"Q. * * * Did you ever tell her (mother) to go to hell?

"A. I might have lost my temper and said something like that.

"Q. * * * Did you ever tell her to keep her damned mouth shut?

"A. I might have in losing my temper. * * *

"Three or four occasions I threw dishes at my sister during the past several years. * * *

"My sister and I got along quite well together at times. We would have little arguments about my friends that I went to school with but nothing serious. * * *

"I don't recall that William beat father up. * * *

"They had some battles. * * *

"Q. * * * After she (wife) was taken to the hospital, * * * you started to drink to excess, did you not? * * *

"A. I had to drink to keep awake. * * *

"Q. There was a scuffle over a bottle of gin (during wife's last illness) out there in front of the hospital? * * *

"Did you have a bottle of gin along with you?

"A. Yes, I had a bottle with me. I needed it. * * *

"Q. Did your sister at that time tell you to brace up and quit your drinking?

"A. * * * She told me that for over a period * * * of years. * * *

"I have seen William strike or beat my sister Marjorie, I have seen him slap her a few times. * * *

"Q. Did your mother ever express any fear of William? * * *

"*A*.   I believe that she was afraid of him there for a while after those suits and so forth, and the doctor came over there, and, I believe, told her that William had been a little batty since he was young, or since he was a child, he wasn't quite right, and I believe she felt there for a while that there was some danger.   *   *   *

"My mother had general knowledge of the condition of my business   *   *   *   and the losses in my business.   As to whether that worried her, I imagine it concerned her.   *   *   *

"My sister was always talking about me coming in drunk."

Witnesses for contestants testified that Marjorie made derogatory remarks about William's wife and also about Fredrick's wife; that she complained about Fredrick's drinking and lack of attention to business; and that she criticized his associates. There was also testimony that the mother and Marjorie went to the house trailer in which Fredrick lived to ascertain why he did not come home; that Marjorie repeatedly telephoned his friends to ascertain his whereabouts, if he was drinking, and with whom he was associating. There was testimony that the mother and Marjorie went to the office of Fredrick's physician to ascertain if he had a venereal disease and were assured that he did not.

Marjorie denied having made the alleged derogatory remarks about William's wife and denied having criticized Fredrick's friends and associates. She testified in part:

"As to how father and William got along, they were forever battling.   *   *   *

"If he (Fredrick) was married he kept it a deep, dark secret.  No one of us was ever allowed to know.   *   *   *

"I never told mother that Fred was a drunkard; it wasn't necessary; she was there and could see and know.   *   *   *

"Fredrick told us that he lived in a trailer. * * * I have been over there to see him at mother's request when he did not show up around home; she would worry, and send me after him * * * to tell him to come home. * * * He would tell me to mind my certain kind of business and get out of there. * * *

"He would be gone for days and weeks sometimes, and the general practice was to call those who might know of his whereabouts, his friends, and his associates. * * *

"It wasn't necessary to tell mother anything; she had a mind of her own and was well able to recognize anything that was there; she knew all her children well. * * *

"She wanted me with her and we were together, I would say, almost constantly. * * *

"Fred had never told us that he was married. I remember mother, and I * * * questioned him about it, because * * * we were both so concerned about his absence from the home. * * * He evaded it on every occasion. * * *

"Mother had warned Fredrick over a period * * * possibly 2 or 3 months if he didn't stop his drinking and if he didn't arrive home at a respectable hour she would be obliged to take the key from him. * * *

"Father and William had many, many battles. The day of the fight between them down in the basement when mother and I returned from visiting relatives, * * * as mother unlocked the door, * * * William came up and he had the butcher knife in his hand. * * * Mother said, 'Oh, call the police. William is threatening my husband with a butcher knife and beating him up in the basement.' And the next thing I knew, the detectives were there. * * *

"I was present only once when William called upon mother in the hospital. * * * William was very insulting. * * * William stood up and said

to mother, 'Well, when they get ready to slice you up, let me know.' * * *

"As an older boy he (William) * * * became very brutal and cruel. * * * If mother would attempt to correct him or reprove him, he would strike at her and kick at her. On many occasions I was present when William struck and beat my mother. The last time William struck mother was shortly before he left home. I think that was in 1924. * * * Mother had been talking with him for quite some time and trying to plead with him over something. William disliked it very much and he turned right around without any moment's notice or indication, * * * gave mother one awful push and she went over and struck her back against the mission couch below the center of her back near the spine and mother fainted. * * * That lump appeared and remained there to her death. * * *

"I recall other times when William beat or struck my mother. There was one time in the kitchen, I don't remember what it was about, but he struck mother. * * *

"I know of my own knowledge that Fred has come home under the influence of liquor. * * *

"Fred's conduct around the house was insulting and cruel. * * * Fred called mother vile names and used obscene language. He used language mother used to say befitted the underworld. * * * I heard Fred testify that he has thrown things at me. * * * In addition to that he has kicked over lamps, * * * thrown dishes and some cut glass ware. * * * He has broken things that mother prized very dearly, wedding presents, and so on. * * *

"The occasion for these outbursts was usually in regard to mother's reproving him about drinking and keeping late hours."

The mother's statements to Mr. Springman of the Detroit Trust Company and her attorney prior to and at the time she executed the will in question, and

her statements to friends and others who testified for proponent, clearly establish that her will represented her own well-considered judgment and decision as to the distribution she wished to make of her property. Mr. Springman had known the mother for about 15 years and had advised and counseled with her regarding investments. He testified in part:

"After the death of Mr. Hannan, on many occasions * * * Mrs. Hannan * * * would say that she was going to make her will one of these days and as soon as she can make up her mind definitely what to do about Fredrick. She disclosed to me the nature of her uncertainty about Fredrick. She first made that remark about five years before she made her will last fall. * * * The nature of her uncertainty was she just said that she wanted to see how Fred worked out and his ability to handle money and whether or not he settled down. * * *

"At one of these contacts, right at the very beginning, she told me about William. * * * Mrs. Hannan said so far as William was concerned she wanted to make sure that he didn't get any of her estate; that is one of the reasons why she wanted to make a will, to make sure that William didn't get any of her money. She mentioned that she thought that William had been an undutiful son and that he didn't deserve anything and that so far as she was concerned that he didn't hardly exist. * * *

"The next time I had contact with Mrs. Hannan regarding the making of a will was at the hospital. * * * She said that she was definitely ready to make her will. * * *

"Then the conversation came as to exactly what she wanted in that will. She said, 'Of course, there is no question about William.' She said. 'I want to give him $1.' * * * And she said, * * * 'You can put in there about how cruel a man and that he was not a good son at all.' Mrs. Hannan thought

probably you (attorney Haefele, who was examining witness) would put that language in the will.

"You, Mr. Haefele, suggested possibly that that was not particularly the thing to do.   *   *   *   You commented · that you thought probably that there was no particular need or it was not particularly well to have that in public print.   *   *   *

"Mrs. Hannan then wanted to say that William *   *   * had been cruel and at one time that he had pushed her over a couch and she still had a bump on her back from it,   *   *   * · and she was worried terribly about William causing trouble following her death.   *   *   * She said that she did not want William to get anything; her idea was to give William a dollar.

"You, Mr. Haefele, suggested that she give him something. You pointed out to her that probably in view of the fact that she was so afraid of William causing her daughter trouble afterwards, that maybe it would be well to leave him a little cash to create a little better feeling and possibly to stop any possible trouble he might give, her.   *   *   *

"At that conversation on September 24th, Fred was discussed in relation to the will. She said Fred's problem was the one that had been disturbing her right along, and, she said, Fred had an utter disregard for the value of money and that she simply would not give him any amount of money outright, because, she said, that she had no confidence in his ability to handle money or how to control it and she thought it would be contributing to weaknesses.   *   *   * She said, 'Fred has had a lot of money and he has gone through it,' and *   *   * she was concerned about Fred in later years; she wanted to make sure that he did not go in want. *   *   *

"She made the remark that she thought that Fred would be constantly after Marjorie for more money; *   *   * she said   *   *   * that Marjorie had been a marvelous daughter and   *   *   * that she has

had enough family trouble in her lifetime and she was entitled to live in a little peace. * * *

"There was further discussion regarding the amount to be put aside for Fred. She said that she did not want Fred to have much money at any one time. * * * As to when this annuity should start, she said she thought around the age of 40; she said, 'By the age of 40 he ought to be settled down and have some judgment of handling money.' * * *

"I first discussed the making of a will with Mrs. Hannan in about 1936. At that time she told me that she wanted to make sure that William would not get anything."

The nurse who attended the mother during her last illness in the hospital testified in part:

"I was present when Fred visited Mrs. Hannan (at the hospital) upon five occasions. On, I would say, three of these occasions I noticed the odor of intoxicating liquor on Fred's breath. On one occasion when the odor of alcohol was quite prominent on Fred's breath, Mrs. Hannan said to him how she couldn't stand that smell. * * *

"Mrs. Hannan told me she didn't think that Fred tended to business as he should but blamed it mostly on his association with friends."

A witness for proponent, who had known the Hannan family for over 20 years, visited the mother in the hospital during her last illness. He testified in part:

"The mother * * * seemed to be lost at the way that William had acted and she stated that he had been everything but a son to her and the things that he had tried to do at the time of the father's death and also the way he had acted since to the other members of the family. * * * She said as far as Fred was concerned, she rather felt sorry for him, * * * that apparently he had gotten

into the wrong company   *   *   *   and that he had lost a lot of his money.''

A witness for proponent who had been employed for many years as secretary for another member of the Hannan family testified in part:

''William said that he couldn't get along with the family, or couldn't get along with any member of the family.   *   *   *

''He said that he had been having a fight with Marjorie, the sister, and that Mrs. Frank Hannan tried to separate them and that he had struck his mother.   *   *   *

''William did not show any filial regard for either his father or mother in any of his conversations with me. Everything William said was in an antagonistic spirit toward the parents.''

Marjorie's husband testified regarding his interviews with the mother in part as follows:

''Mrs. Hannan had conversations with me about her family at different times. One particular time was on March 17, 1941.   *   *   *   She said she didn't consider him (William) a member of the family, he has by his conduct alienated himself from the family; he has chosen to remove himself from their presence. One time he was away 10 years. His abusiveness in language and physically was something I [she] couldn't stand.   *   *   *   She mentioned   *   *   *   how he had secured an attorney and through him tried to gain control of Mr. Hannan's property.

''Mrs. Hannan told me how William would beat the father up.   *   *   *   She told me of the language William used, not only profane but obscene. *   *   *   She said that when she would protest at the boy's staying out late hours, the remark would be made, 'Go to H.'   *   *   *   She said that one time when she was remonstrating with William about his abusiveness, he pushed her over a daven-

port and injured her back, that the marks of that injury were still remaining.   *   *   *

"Mrs. Hannan told me that she had asked Fred to get rid of some of the companions he had, that they were detrimental to his business and to his health, because of their proclivity to drink.   *   *   *

"She told me of Fred's coming in at a late hour at night and that on one occasion very late   *   *   * he was in a more or less state of stupor, and it had happened so often she decided to take the key away from him."

An officer of the Detroit Trust Company in charge of the Frank Hannan estate testified: "In the course of the administration of the estate I had opportunity to observe the relationship existing between William and his mother. It was unfriendly; unharmonious." Another acquaintance of the family testified that in 1941 the mother said "that she regretted that Fred did not know how to handle money and that he was so easily influenced by bad companions." The daughter Marjorie had been closely associated with her mother for many years, but undue influence cannot be inferred from this association. In the case of *In re Williams' Estate,* 185 Mich. 97, 118, we said:

"Opportunity alone cannot give rise to a valid inference that undue influence has been exercised. *In re Shanahan's Estate,* 176 Mich. 137; *In re Foerster's Estate,* 177 Mich. 574."

See, also, *In re Livingston's Estate, supra; In re Teller's Estate,* 288 Mich. 193; *In re Reed's Estate, supra.*

The law is well established in this State that to establish coercion and undue influence, contestants must prove that the will of the testator was dominated and overcome, that his free agency was destroyed, that he was rendered incapable of acting upon his own motives, and that he was prevented

from exercising his own free judgment and discretion in the disposition of his property. In the case of *In re Hoffman's Estate,* 300 Mich. 406, 418, we said:

"Influence, in order to be classed as 'undue,' must place the testator in the attitude of saying 'It is not my will, but I must do it.' The coercion or compulsion must be such that free agency is destroyed. The dominating mind of another must dictate what the testator shall do and compel him to adopt the will of another instead of exercising his own. The facts may show that he was advised, persuaded, solicited, importuned or entreated, but, so long as he is not rendered incapable of acting finally upon his own motives and so long as he remains a free agent, his decision is his own and the action is his own and not that of another. *In re Williams' Estate,* 185 Mich. 97; *In re McIntyre's Estate,* 193 Mich. 257; *In re Balk's Estate,* 298 Mich. 303.''

In the case of *In re Reed's Estate, supra,* objections were filed to the admission of the will of Alfred Reed on the ground of coercion and undue influence. The trial court held the will was void because of undue influence, and judgment was entered for contestants. In reversing this judgment and sustaining the will, Justice POTTER said (pp. 341, 342, 344, 346):

"Undue influence will vitiate a will only when it is sufficient to overcome the free agency of the testator so that the will which results from his intelligent action speaks not the will of the testator himself, but of someone else. * * * The law provides for the making and execution of wills, and how property shall pass under the statutes of descent and distribution in case the testator does not seek to dispose of it by will. The fact the testator disposes of his property in some other way than under the statutes of descent and distribution, instead of indicating a lack of testamentary capacity,

indicates the testator knew he had a right to dispose of his property, and availed himself of the provisions of the statute,* disposing of his property as he saw fit.  *  *  *

"Undue influence to vitiate a will must have been such as to amount to force and coercion, destroying the free agency of the testator, and there must be proof that the will was obtained by this coercion. Undue influence cannot be presumed, but must be proved and in connection with the will and not with other things. A will may not be set aside on the ground of undue influence unless such influence amounted to a degree of constraint such as the testator was too weak to resist and such as deprived him of his free agency and prevented him from doing as he pleased with his property. Neither advice, nor arguments, nor persuasion will vitiate a will made freely from conviction, though such will might not have been made but for such advice or persuasion. Undue influence is a species of fraud and, like fraud, must remain undefined by the courts. All that can be done is to lay down certain general principles, and what is said above embraces those general rules which have been adduced from adjudicated cases. *Maynard* v. *Vinton*, 59 Mich. 139 (60 Am. Rep. 276).  *  *  *

"Undue influence cannot be predicated upon opportunity alone, nor upon a disposition of property not in accord with the statutes of descent."

In the case of *In re Teller's Estate, supra,* we said (p. 198):

"The general rule is that every person of full age and sound mind is at liberty, in making a will, to select the objects of his bounty among his relatives at discretion, or pass them all by, if he is so disposed. The principle of law applicable in the case at bar is well stated in *Re Spinner's Estate,* 248 Mich. 263, where we held that in order to estab-

---

* See Act No. 288, chap. 2, § 1, Pub. Acts 1939 (Comp. Laws Supp. 1940, § 16289-2[1], Stat. Ann. 1943 Rev. § 27.3178[71]).—REPORTER.

lish undue influence contestants must prove that improper influence was exerted, that it had the effect of overcoming the will of testator; and that some influence may properly be used. Only when the testator's will is overcome is the result invalid. *Schneider* v. *Vosburgh*, 143 Mich. 476. Undue influence may not be established by proof of opportunity alone. *In re Murray's Estate*, 219 Mich. 70.''

In affirming a judgment sustaining the will notwithstanding the jury's verdict to the contrary, in the case of *In re Livingston's Estate, supra,* we said (p. 643):

"It is not the province of the court or jury to substitute their judgment for that of the testator, or to correct a seeming injustice. So long as the testator was of sound mind and expressed his own desires in the instrument, he was at liberty to make whatever disposition he chose.''

In the case of *In re Estate of Reynolds,* 273 Mich. 71, 78, we stated: ''There must be proof of acts of domination.'' In *Latham* v. *Udell,* 38 Mich. 238, 242, we said: ''There can be no fatally undue influence without a person incapable of protecting himself, as well as a wrong-doer to be resisted.'' In the case of *In re Shepard's Estate, supra* (pp. 463, 464), we said: ''The evidence should be convincing in a high degree to warrant the annulling of the product of an unquestionably competent mind.''

See, also, *In re Cotcher's Estate,* 274 Mich. 154; *In re Fox's Estate,* 240 Mich. 465; *In re Jackson's Estate,* 220 Mich. 565; *In re Klink's Estate,* 210 Mich. 614; *In re Williams' Estate, supra; In re Weber's Estate,* 201 Mich. 477; *In re Shepard's Estate, supra; Beyer* v. *LeFevre,* 186 U. S. 114 (22 Sup. Ct. 765, 46 L. Ed. 1080); 1 Page on Wills (3d Ed.), pp. 364, 365, § 183; pp. 368, 369, § 184; pp. 370, 371, § 185.

To establish their allegation that their sister Marjorie fraudulently induced the mother to make the will in question, it was incumbent on contestants to prove that she had misrepresented material facts and that the mother relied upon and was influenced by these misrepresentations in disposing of her property. *In re Barth's Estate,* 298 Mich. 388; 1 Page on Wills (3d Ed.), p. 353, § 179. The record clearly indicates that the mother was entirely conversant with the conduct and habits of her sons. By his own misconduct William had apparently embittered his mother against him. Fredrick by his misconduct had caused his mother to lose faith in his ability to conduct himself properly and to handle his financial affairs. Considering the sons' misconduct and their mistreatment of their mother, and considering the fact that Marjorie had devoted many years of her life to assisting and caring for her mother, it cannot be said that the will was unreasonable or unnatural. In the case of *In. re Cottrell's Estate,* 235 Mich. 627, 631, 632, we stated: "The will was not an unnatural one. Proponent had practically given her life's work to her father; she had been a dutiful daughter."

The testimony of contestants and their witnesses goes no further than to show the tempestuous home life in the Hannan family and the continual bickering and quarreling between the brothers and their sister and her more or less justified criticism of them. The record is convincing that the mother had carefully considered and determined what disposition she wished to make of her property and that she acted of her own free will and as a free agent. In the exercise of her discretion and judgment, she disposed of her property in the manner which to her seemed just and proper. We find no testimony indicating that Marjorie's criticism of the conduct

and habits of her brothers or her criticism of their wives and associates unduly influenced the mother in the making of her will. Nor do we find testimony indicating that she misrepresented any material facts which unduly influenced the mother. It is clear that the mother was of sound mind and that her will represented her desires and her own free decision and judgment as to what disposition she wished to make of her property. *In re Livingston's Estate, supra.*

We conclude that, viewed in the light most favorable to contestants, the evidence did not present questions of fact regarding fraud, coercion or undue influence, for jury consideration. Other questions do not require determination.

The trial court erred in not granting proponent's motion for a judgment notwithstanding the verdict. The judgment for contestants is reversed. The case is remanded to the trial court with direction to enter judgment for proponent sustaining the will, and to remand to the probate court with direction to admit the will to probate.

Proponent may recover costs of both courts.

BUTZEL, C. J., and CARR, SHARPE, BOYLES, REID, and NORTH, JJ., concurred. BUSHNELL, J., took no part in the decision of this case.